[No. 50-40452-3.     Division Three.     June 16, 1970.]

MARIA LUCAS, *Appellant*, v. E. FREDERICK VELIKANJE, *Respondent.*

*J. P. Tonkoff* (of *Tonkoff & Dauber*), for appellant.

*Norman R. Nashem, Jr.* (of *Nashem, Prediletto & Fortier*), for respondent.

GREEN, J.—Plaintiff, Maria Lucas, appeals from an order granting a partial summary judgment and from a judgment

entered on a jury verdict in favor of defendant, E. Frederick Velikanje, in an action for malpractice.

On April 24, 1957, plaintiff married Paul Lucas; they lived near Yakima. Both owned substantial properties and had children by prior marriages. They executed an antenuptial agreement providing essentially that upon the death of either the survivor would not share in the other's estate, except plaintiff was to receive $500.

On August 16, 1964, Paul Lucas was hospitalized in Seattle because of recurring emphysema. On August 19, 1964, plaintiff who was also then in Seattle telephoned defendant, her attorney in a prior divorce action, and stated that Mr. Lucas was in the hospital and wanted some papers prepared. That evening about 11 p.m. defendant arrived in Seattle and went directly to the hospital. Upon entering Mr. Lucas' room, defendant said: "Maria had asked me to come over and said that you wanted some papers drawn and . . . you wanted to make some changes in your estate." Mr. Lucas replied, "I have my own attorney. I don't want your services"; he stated his own attorney would draw a trust but he was not going to do anything about it until he returned to Yakima; and that when the trust was signed everyone would be taken care of. The defendant asked if there was anything he could do for him. Mr. Lucas replied, "No." Mrs. Lucas commented several times in the background, "What about Maria?"

On August 21, 1964, plaintiff again called defendant requesting that he return to Seattle and stating that Mr. Lucas wanted to make changes in his estate. Defendant refused to go unless joined by Howard Elofson, Mr. Lucas' personal attorney. Mr. Elofson agreed and accompanied defendant to Seattle. Upon arrival, Mr. Elofson consulted privately with Mr. Lucas who told him that at this time he didn't want to do anything. Defendant saw Mr. Lucas only to say "hello." Thereafter, defendant advised plaintiff that he could not make any changes in her husband's estate. Plaintiff referred to notes with the words "Cadillac" and "home" written on them and asked if these were adequate

to convey title to the named pieces of property. Defendant told her they were not.

On August 30, 1964, Mr. Elofson went alone to Seattle to confer with Mr. Lucas; he was instructed to prepare a trust agreement. On September 3, 1964, he returned to Seattle and Mr. Lucas executed the trust agreement. The trust was for a term of 3 years; it included substantially all of Mr. Lucas' property; the National Bank of Commerce of Seattle and Robert L. Lucas, a son, were named cotrustees. The income was to be paid to Mr. Lucas; and if necessary to meet his needs, the principal could be invaded. In the event of Mr. Lucas' death during the existence of the trust, his sons, Robert and Richard, were to be the principal beneficiaries of the trust; the plaintiff was to receive $10,000 on condition she had commenced no action for divorce against Mr. Lucas and was then living in his home in Yakima.

By early December 1964, Mr. Lucas' condition improved; he returned to his home in Yakima under the care of a male nurse. On December 16, plaintiff again telephoned defendant, stating Mr. Lucas wanted him to come to their home. Defendant refused unless this request was confirmed by Mr. Lucas and only if Mr. Elofson was also present. The request was confirmed. Mr. Elofson and defendant drove separately to the Lucas home on Thursday, December 17, arriving about 1:30 p.m. Mrs. Lucas took them directly to Mr. Lucas' bedroom where defendant observed that while Mr. Lucas' physical appearance was not good, it was much better than when he was hospitalized. Mr. Lucas told the attorneys he wanted to change his estate and leave everything to plaintiff. Thereupon, Elofson with Mr. Lucas' permission revealed the existence of the trust agreement. While standing at the end of the room furthest from the bed, both attorneys read and discussed the trust. Defendant commented to Mr. Lucas that inasmuch as the trust provided it was to be irrevocable, he didn't know how it could be revoked. Mr. Lucas then said he wanted the attorneys to work together to find a way to revoke the trust. Defendant received the impression that he, in consultation with Elof-

son, was to spearhead research on the problem of revocation. Mr. Lucas told defendant that everything he had was in the trust. Defendant told Mr. Elofson that because the irrevocable provision was difficult to get around, he had extensive briefing to do. Both attorneys were to begin briefing the problem independently. When Mr. Lucas was asked about the ante-nuptial agreement, he used "tearing" motions indicating he wanted it torn up. Defendant asked where it was. Elofson said he had it and would take care of it. As the attorneys were leaving, Mr. Lucas privately requested Elofson to return the following day.

Defendant returned to his office where he consulted with members of his firm concerning the trust and began extensive research. Defendant secured evidence of title to the assets under the trust and discussed with the trust officer of the National Bank of Commerce, cotrustee under the trust, what their attitude would be relative to withdrawing from the trust.

The next day, Friday, Elofson visited privately with Mr. Lucas in his bedroom. Lucas told Elofson he wanted to leave the trust as it was, irrevocable. He stated his wife had him down and he didn't know what to do; that there was terrible jealousy between his wife and his son, Robert, and he wanted Mr. Elofson to let her own lawyer give her the bad news that the trust couldn't be revoked. Mr. Lucas was going to "play it dumb" and he admonished Elofson to do likewise. Thereafter, Elofson returned to his office and made a memorandum of the conversation. This memorandum was admitted into evidence wherein it is noted that Mr. Lucas felt that he was "nailed to the cross by her."

On the afternoon of Friday, December 18, defendant called Elofson and told him he did not believe the trust could be revoked without the consent of Mr. Lucas and the beneficiaries. He indicated he would continue his research to find another way to revoke the trust. In the early morning of December 19, Mr. Lucas had a sudden episode of respiratory distress requiring his hospitalization. Later that day plaintiff called the defendant at his office where he was

still briefing. Plaintiff asked if defendant would contact Mr. Elofson and determine how he was coming along with the papers. Defendant replied he would do his best to talk with him. Elofson stated he would have the papers ready on Monday. On Sunday, December 20, plaintiff informed defendant that Mr. Lucas died. Defendant then called Elofson who told him of his private conversation with Mr. Lucas on Friday, December 18.

On August 10, 1965, plaintiff brought an action against Robert L. Lucas and others to obtain title to the property covered by the trust. She was unsuccessful. Maria Lucas v. Robert Lucas, Yakima County No. 48905. No appeal was taken. Thereafter, plaintiff brought this action for malpractice against defendant.

First, plaintiff claims the court erred in granting a partial summary judgment to defendant. Among other things, plaintiff in her complaint against the defendant alleged that he undertook on behalf of plaintiff and Paul Lucas to revoke the irrevocable trust that Mr. Lucas executed. Plaintiff claimed this trust was executed under circumstances which amounted to duress, undue influence and misrepresentation by Robert Lucas and that defendant was guilty of malpractice in failing to discover and preserve evidence of such fraud. As a result, plaintiff was deprived of inheriting property from Mr. Lucas to her damage. Defendant denied the claim and alleged as an affirmative defense that plaintiff was estopped from asserting this claim because it was previously litigated and decided adversely to plaintiff in Lucas v. Lucas. Defendant then moved for summary judgment based upon the pleadings and depositions in the instant case and the pleadings and instructions in Lucas v. Lucas. The trial judge ruled the issue raised by plaintiff's allegations out of the instant case on two grounds: (1) there was a jury determination in Lucas v. Lucas of no fraud, undue influence or misrepresentation by Robert Lucas in the execution of the trust; and (2) by reason thereof no charge of malpractice would lie against

defendant for his failure to discover a fraud that did not exist.

Prior to *Henderson v. Bardahl Int'l Corp.*, 72 Wn.2d 109 431 P.2d 961 (1967), it was said that collateral estoppel by judgment and res judicata are similar doctrines whose purpose is to prevent retrial of already determined actions or issues thus bringing an end to litigation. Res judicata bars relitigation of the same cause of action between the same parties where there is a prior judgment; whereas, collateral estoppel bars relitigation on a particular issue or determinative fact. *Bordeaux v. Ingersoll Rand Co.*, 71 Wn.2d 392, 429 P.2d 207 (1967). In *Bordeaux*, the court said at page 396:

> Both doctrines require a large measure of identity as to parties, issues and facts, and in neither can the party urging the two doctrines as a defense be a stranger to the prior proceeding. He must have been a party, a participant, or in privity with either, and the action out of which the bar is claimed must be qualitatively the same as the case in which the doctrine is set up as a bar.
>
> . . .
>
> . . .
>
> We recognized this principle in *Owens v. Kuro* [56 Wn.2d 564, 354 P.2d 696 (1960)], *supra*, when we said:
>
> > A judgment is not *res judicata* nor is one collaterally estopped by judgment in a later case if there is no identity or privity of parties in the same antagonistic relation as in the decided action. . . . An estoppel must be mutual and cannot apply for or against a stranger to a judgment since a stranger's rights cannot be determined in his absence from the controversy.

The court required the judgment be mutual as between the parties to the second action; that is, one could not invoke an estoppel unless he would have been bound had the action gone the other way. The modern trend is to reject the requirements of privity and mutuality as conditions to the application of collateral estoppel, particularly where it is used defensively. *Bernhard v. Bank of America Nat'l Trust & Sav. Ass'n*, 19 Cal. 2d 807, 122 P.2d 892 (1942); 2 Orland, Wash. Prac., Trial Practice, § 390 (Supp. 1970); *Col-*

*lateral Estoppel—Demise of Mutuality in Washington?* 44 Wash. L. Rev. 449 (1969).

In *Henderson,* the plaintiff attempted to use collateral estoppel by judgment offensively as to an issue determined against the defendant in a prior case where plaintiff was neither a party nor in privity with either party. Plaintiff urged our Supreme Court to adopt the modern trend of collateral estoppel, citing *Bernhard* and other supporting authorities, and to reject the doctrine of privity and mutuality. The court held the doctrine could not be applied because the issues were not the same as those in the prior case and that application of the doctrine would work an injustice on the defendant. Nevertheless, the court said at page 116:

> We recognize that there are many cases where the issues of mutuality, privity, and the offensive-defensive distinction should not be permitted to obstruct the application of collateral estoppel by judgment.

This language indicates our Supreme Court will reject the requirement of privity and mutuality and adopt the modern trend in a proper case where the application of collateral estoppel will not work an injustice. We believe this is a proper case.

■ Before the doctrine of collateral estoppel can be applied, affirmative answers must be given to the following questions: (1) Was the issue decided in the prior adjudication identical with the one presented in the action in question? (2) Was there a final judgment on the merits? (3) Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication? (4) Will the application of the doctrine not work an injustice on the party against whom the doctrine is to be applied? *Bernhard v. Bank of America Nat'l Trust & Sav. Ass'n, supra; Henderson v. Bardahl Int'l Corp., supra.*

Plaintiff in her brief seems to concede that this state has adopted the modern trend, but contends the evidence prevents its application in this case. We disagree. It is patent that, since the jury in Lucas. v. Lucas found there was no

fraud, undue influence or misrepresentation practiced by Robert Lucas upon Paul Lucas when the latter executed the trust, plaintiff should not be permitted to claim in this action that such fraud, undue influence or misrepresentation did occur and defendant was negligent when he failed to discover it. Further litigation on that issue in the instant case is barred by collateral estoppel. Our review of the entire record convinces us that collateral estoppel should be applied in these circumstances.

Second, plaintiff claims the court erred in refusing to allow her to testify with respect to the attitude of her husband on the day previous to the execution of the trust agreement; further, the court should have allowed plaintiff to cross-examine Mr. Elofson as to the circumstances under which Paul Lucas provided for a $10,000 distribution to plaintiff and occupancy of the Lucas home for 1 year following his death on condition plaintiff had not commenced divorce proceedings at the time of his death. This testimony is relevant only to the issue litigated in Lucas v. Lucas. In view of our holding that plaintiff was collaterally estopped by the adverse judgment in that case, the trial court properly excluded such testimony in this case.

Third, plaintiff contends the trial court erred in ruling that the trust agreement was irrevocable. The trust provided:

> F. *Amendment, Revocation and Termination.*
>
> *This Agreement shall not be subject to amendment except as to the identity and authority of trustees, and this trust shall be irrevocable.* This trust, shall without further action of the parties, automatically terminate three years from the date hereof unless Trustor is then laboring under an incapacity so that he is unable to handle his business affairs, and in the event of such incapacity this trust shall continue until such incapacity is overcome and this trust shall then terminate.

(Italics ours.) The thrust of plaintiff's argument is that Mr. Lucas was the sole beneficiary of the trust and consequently it could have been revoked by him notwithstanding the irrevocable language. This position is based upon the

reserved right of Mr. Lucas to change the identity and authority of the trustees. Plaintiff contends this gave Mr. Lucas the right to name himself trustee and thereafter encumber, convey, alienate or dispose of the property as he desired. Mr. Lucas was to also receive the income of the trust during his lifetime and on termination all of the property would revert to him. Based on these circumstances, plaintiff contends Mr. Lucas became the sole beneficiary of the trust. From this conclusion plaintiff argues that if defendant had prepared a revocation of the trust and the ante-nuptial agreement and prepared a will immediately after the request of Mr. Lucas, plaintiff would have inherited his estate. We disagree.

■ It is the general rule that, in the absence of an express reservation, a trustor cannot revoke a trust without the consent of the trustee and all beneficiaries. An exception exists where the trustor is the sole beneficiary. Bogert on Trusts, 4th ed. §§ 148, 152 (1963); Restatement (Second) Trusts § 330 et seq.; 62 A.L.R.2d 1412 (1958); 54 Am. Jur. Trusts § 84. In the instant agreement, the trustor expressly stated the ". . . trust shall be irrevocable." His intention that it be irrevocable is further supported by the following provision:

> Trustor has been subject to great stress in conquering his current illness and cannot predict how he might react to threats or promises of others if he became more ill. It is his intention that all of the Trust Estate be distributed as described above regardless of the pressures put upon him. For this reason it is agreed that the beneficial interest in the principal of the Trust Estate of any beneficiary hereof, including but not limited to, trustor, shall not be subject to the claims of the respective beneficiaries, creditors or others, nor to legal process and shall not be voluntarily or involuntarily assigned, alienated or encumbered.

The term of the trust was for 3 years and in the event of the death of Mr. Lucas during that time, the trustees were directed to distribute the trust assets to specifically named persons. The other provisions provided the income be paid

to the trustor during his lifetime with very limited provisions for invasion of the corpus to maintain the trustor's customary standard of living. A change in identity or authority of the trustees would have no effect upon the trust because the trustee must function in accordance with all of the provisions of the trust. Reading the trust agreement as a whole, the reservation to amend as to identity and authority of the trustee was never intended to give the trustor such power that he could in effect make himself the sole beneficiary of the trust. Plaintiff's contention to the contrary is without merit. In view of our holding, the court properly gave instruction No. 11 and refused to give plaintiff's proposed instruction No. 18.

Plaintiff relies upon *Hall v. Malstrom*, 29 Wn.2d 746, 189 P.2d 471 (1948); *McKenna v. Seattle-First Nat'l Bank*, 35 Wn.2d 662, 214 P.2d 664 (1950); *Berlenbach v. Chemical Bank & Trust Co.*, 235 App. Div. 170, 256 N.Y.S. 563 (1932); and *Aranyi v. Bankers' Trust Co.*, 201 App. Div. 706, 194 N.Y.S. 614 (1922). All of these cases involve trusts providing that on the death of the trustor, the assets of the trust be paid either for the use and benefit of the decedent's estate or to persons named in the decedent's last will and testament or to unnamed children of a specific individual. Further, the trustor failed to vest the remainder in specifically named living persons. Therefore, it was held the remainder vested in the estate of the trustor; as a consequence, the trustor was the sole beneficiary and the trust was revocable. However, the instant case is to be distinguished. The Paul Lucas trust immediately vested the remainder in specifically named living persons. Hence, the rule cited by plaintiff is not applicable.

Fourth, plaintiff claims error in the giving of the following instruction No. 7:

A witness who had special training, education or experience in a particular science, profession or calling may be allowed to express an opinion in addition to giving testimony as to facts. You are not bound, however, by such an opinion. In determining the credibility and the weight to be given such opinion evidence, you may con-

> sider, among other things, the education, training, experience, knowledge and ability of that witness, the reasons given for his opinion, the sources of his information, together with factors already given you for evaluating the testimony of any other witness.

on the ground the instruction told the jury it could reject the testimony of an expert. It is also contended the instruction is in conflict with another instruction that a recovery for malpractice must be grounded upon expert testimony establishing a standard of practice in the profession with respect to the subject matter involved. We disagree. The testimony of the experts was conflicting. Consequently, in order to reach a result in favor of either party, it was necessary for the jury to reject some of expert testimony. Therefore, the instructions were not in conflict and were properly given.

Fifth, plaintiff asserts error in the giving of an instruction withdrawing the issue of defendant's failure to employ other counsel to assist in revoking the trust and that defendant wrongfully disclosed confidential information. Error is also claimed in the court's refusal to give plaintiff's proposed instruction on the issue of employment of other counsel. Since the trial court properly found the trust to be irrevocable, employment of other counsel could not have changed that situation. The record fails to show defendant wrongfully disclosed confidential information. There was no error in the giving of the instruction and refusing to give the proposed instruction.

■ Sixth, plaintiff assigns error to the failure to give her proposed instruction No. 10 that if the jury found defendant could have adopted but failed to adopt measures of precaution possessed by other Washington attorneys to accomplish his undertaking to his client and that such failure caused loss to the client, then defendant was guilty of malpractice. This proposed instruction was covered by the court's instructions 6 and 7. Since the theories urged by plaintiff in her brief could be adequately argued under those instructions, there was no error in refusing the proposed instruction.

■ Seventh, plaintiff claims error in the giving of WPI 2.06, an instruction that no adverse effect should be inferred from the fact that a witness has been interviewed by any party or his attorney or representative. Further error is asserted in the refusal to give plaintiff's proposed instructions No. 4 and 5 instructing that plaintiff was not required to prove every claim of negligence or malpractice and that one or more were sufficient and that admissions of either party must be accepted as proven fact. Since no authority is cited for these claimed errors and it is not apparent, without further research, that they are well taken, they need not be considered. *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 372 P.2d 193 (1962); *Wagner v. Wagner*, 1 Wn. App. 328, 461 P.2d 577 (1969). In any event, our review of the record discloses no error.

Last, plaintiff claims error in the refusal to give proposed instructions No. 3 and 9, both relating to the negligence and duties of an attorney in behalf of his client. No error was committed because the proposed instructions were adequately covered by those given. Likewise, there was no error in refusing to give proposed instructions No. 6 and 14 relating to circumstantial evidence since subject matter was adequately covered by the instructions given.

Judgment affirmed.

EVANS, C. J., and MUNSON, J., concur.

---

Petition for rehearing denied July 23, 1970.