[No. 38795. En Banc. September 21, 1967.]

J. A. HENDERSON, *Appellant,* v. BARDAHL INTERNATIONAL CORPORATION, *Respondent and Cross-appellant.*\*

\*Reported in 431 P.2d 961.

*Helsell, Paul, Fetterman, Todd & Hokanson, Russell V. Hokanson,* and *Allan D. Loucks,* for appellant.

*Beresford & Booth,* by *Robert O. Beresford* and *Donald P. Lehne,* for respondent and cross-appellant.

HILL, J.—This is an action to recover commissions alleged to be owing to the plaintiff, J. A. Henderson, by the defendant, Bardahl International Corporation.

The plaintiff was originally a distributor of Bardahl products in eastern Canada and, subsequently, in specifically designated countries throughout the world. He appointed Giorgio Geddes as a subdistributor for Italy. Later, the defendant made Geddes its exclusive distributor in certain areas which had originally been the plaintiff's territory. (We shall throughout this opinion refer to the plaintiff as Henderson, the defendant as Bardahl, and Geddes as Geddes, except as the circumstances require specific reference or recognition of various corporate entities.) To make definite the rights and interest of Henderson in sales made by Geddes as the exclusive distributor for Bardahl, Henderson and Bardahl executed an agreement dated January 22, 1959, whereby Bardahl agreed to pay Henderson

[A] sum equal to $1.10 per gallon for each and every gallon of Bardahl concentrate[1] ordered and paid for from Bardahl International Corporation by Geddes, or any person acting by, through or under Geddes, or any sub-distributor of Geddes, for the period beginning June 1, 1957, and ending May 31, 1962, or for so long as Geddes

---

[1] " 'Bardahl Concentrate' was and is a unique and highly effective lubricant" which, "when mixed in varying proportions with certain petroleum products, is now widely used in various ways as a special lubricant and carbon eradicator in automobiles and other devices employing internal combustion engines, and, in addition, has been specifically adapted to many industrial and other uses." (Finding No. 5 in the *Geddes* case.)

shall remain a distributor of Bardahl, whichever period shall be the shorter.

At the time this agreement was executed Geddes had become the exclusive distributor of "Bardahl Concentrate" under contracts of indefinite duration in the following territories, among others: Argentina, Austria, Brazil, Casa Blanca and Morocco, France, Germany, Italy and South Africa.

At that time also there was in the process of negotiation between Geddes and Bardahl a 5-year-distributorship contract. However, differences between them culminated in a notice to the attorneys for Geddes on or about the 26th day of May, 1959, advising that the proposed 5-year contract would not be executed by Bardahl and that the Geddes distributorship would be terminated. Thereafter, by letter received on or about the 28th day of July, 1959, in Florence, Italy, Bardahl notified Geddes that his distributorship was terminated "effective immediately."

In September, 1960, Geddes brought an action in King County against Bardahl, making five claims aggregating $1,637,121.76. A supplemental complaint filed on February 16, 1962, added two claims aggregating $26,899.55.

The case came on for trial on May 14, 1963, and continued through July 19, 1963. The trial court found that the distributorship contract between Bardahl and Geddes "was a contract of indefinite duration, since no termination date was mentioned in any of the correspondence which evidences said contract." The findings, with reference to the termination of the distributorship, were that Geddes had been notified through his attorney on May 26, 1959, that the proposed 5-year-distributorship contract would not be signed, and that all his rights would be terminated; and that on or about the 28th day of July, 1959, he was "given written notice of cancellation of the distributorship contract, effective immediately."

That a reasonable time to have given notice to Bardahl Florence [Geddes] prior to the termination of the existing contract between the parties would have been ninety

days, instead of the sixty-day notice[2] given by defendants [Bardahl]. (Finding No. 11)

Geddes recovered a judgment of $55,498.30. We regard the division of those damages as highly significant.

$19,849.97 represented profits Geddes should have made on sales *prior to the termination of the contract.*[3] At this point it is clear that the trial court in the Geddes case regarded the Geddes contract as terminated by the letter received in Florence July 28, 1959. This is further confirmed by the next item of damage.

$12,821 represented the *additional profit Geddes would have made had there been a 90-day notice of termination instead of a 60-day notice.*[4]

It seems apparent to us that the trial court in the Geddes case recognized that the distributorship was terminated on July 28, 1959, but took the position that the notification of intent to terminate the distributorship—which was given May 26, 1959, a little more than 60 days before the actual termination on July 28—was not reasonable and that Geddes was entitled to a 90-day notice. Consequently, he was permitted to recover the profits he would have made on sales between the termination on July 28 and August 24, 1959—the latter date being 90 days after the notice of intent to terminate given on May 26, 1959.[5]

[2]The 60 days can relate only to the time between May 26, 1959 and July 28, 1959; see footnote 5.

[3]The finding supporting this item in the judgment was: ". . . That prior to the cancellation of the aforesaid contract Bardahl International Corporation [Bardahl] made certain direct sales to Bardahl Florence's [Geddes] subdistributors and dealers without crediting the same to Bardahl Florence [Geddes], on which Bardahl Florence [Geddes] would have received a profit of $19,849.97. . . ." (Finding No. 11)

[4]The finding supporting this item in the judgment was: ". . . That had Bardahl Florence [Geddes] received a ninety-day notice of cancellation instead of a sixty-day notice, Bardahl Florence [Geddes] would, during the additional thirty-day period, have made a profit of $12,821.00 on sales made during that period. . . ." (Finding No. 11)

[5]The appellant Henderson asserts in his brief that the trial court in the Geddes case "specifically found" that the contract between Geddes and Bardahl was "terminated as of August 24, 1959." We find no reference to August 24, 1959, in the findings, conclusions and judgment in that case. The only way that date comes into the case is by the computation indicated.

$13,851 represented "$1.00 per gallon for all concentrate manufactured and sold in Brazil during the period of Bardahl Florence's [Geddes] contract with defendants [Bardahl]."[6]

The foregoing three items—together with two items of $4,416.50 and $4,559.83 which are not here material—make up the judgment of $55,498.30 secured by Geddes in his action.[7]

Why the trial court, in the Geddes case, in computing damages did not divide the amounts Geddes should have received on the Brazilian sales on the basis of sales made before the termination of his contract on July 28, 1959, and those he would have made had there been a 90-day notice of termination instead of a 60-day notice of termination, as it did in the other distributorship areas, is not explained.[8]

The trial court in the present case made that division: It found that of the 13,851 gallons of Bardahl concentrate sold in Brazil, 3,788 gallons were sold prior to July 28, 1959, through Geddes' subdistributors; and that the plaintiff Henderson was therefore entitled, under his contract, to $1.10 per gallon thereon or $4,166.80, which was included in the $8,583.30 awarded to him. The trial court refused to allow Henderson any commission on the other 10,063 gallons sold in Brazil subsequent to July 28, 1959. This is readily understandable, because the undisputed testimony was that there

---

[6]The finding supporting this item of the judgment was: "That prior to the termination of Bardahl Florence's [Geddes] contract with Bardahl International [Bardahl], the parties had agreed that Bardahl Florence [Geddes] would receive $1.00 a gallon for all Bardahl Concentrate manufactured and sold in Brazil. That during the period covered by plaintiff's [Geddes] contract 13,851 gallons were manufactured and sold by defendants [Bardahl]." (Finding No. 11)

[7]The parties stipulated that there would be no appeal from this judgment.

[8]There were numerous distributorship agreements between Geddes and Bardahl covering different territories, but there is absolutely nothing in the record to indicate that the one relating to Brazil was any different than the others with reference to the term of its duration, *i.e.*, it was a "contract of indefinite duration." Concededly only one termination date is claimed for all of Geddes' distributorships.

was no concentrate manufactured and sold in Brazil after the 3,788 gallons in March or April, 1959, until during or after September, 1959, subsequent, of course, to August 24, 1959, which Henderson claims was the termination date of the Geddes contract. Henderson does not endeavor to meet this testimony, but takes the position that it should not have been admitted because the parties were bound by the findings in the Geddes case: that 13,851 gallons of concentrate was sold in Brazil "during the period covered by plaintiff's [Geddes] contract."

Henderson's claim on this appeal is that he should have had a judgment for $20,681.10. The difference between that amount and the judgment of $8,583.30, which he has recovered, is $12,097.80. This is made up of sales in three countries all subsequent to July 28, 1959; and with the Brazil sales subsequent to August 24, 1959. The computation is as follows at $1.10 a gallon:

| | | |
|---|---|---:|
| 10,063 | gallons in Brazil .................. | $ 11,069.30 |
| 715 | gallons in Morocco .............. | 786.50 |
| 220 | gallons in Germany ............. | 242.00 |
| | | $ 12,097.80 |

It will be remembered that the contract between Henderson and Bardahl (quoted in the second paragraph of this opinion) provided that Henderson should receive $1.10 on every gallon of Bardahl concentrate sold by Geddes until

May 31, 1962, or for so long as Geddes shall remain a distributor of Bardahl, whichever period shall be the shorter.

The pivotal question in this case becomes: When did Geddes cease to be a distributor for Bardahl?

The trial court in the instant case held that Geddes' distributorship terminated July 28, 1959, when he was notified that his distributorship was terminated "effective immediately."[9] A judgment was therefore entered which

[9] We again note the fact that this was more than 60 days after May 26, 1959, when notice had been given that the Geddes distributorship would be terminated.

allowed Henderson his $1.10 on each gallon of Bardahl concentrate sold by or through Geddes or his subdistributors prior to July 28, 1959, and not previously accounted for. This included 3,788 gallons sold in Brazil which had been ordered in March or April, 1959. The trial court, holding that Geddes ceased to be a distributor of Bardahl on July 28, 1959, refused to give judgment for the additional $12,097.80 which Henderson claimed as his commission on the sales of Bardahl concentrate subsequent to that date. Actually, as heretofore indicated, there were no sales in Brazil subsequent to the 3,788 gallons until September, 1959 or later (probably November, 1959).

Henderson urges that in the Geddes case the trial court found that Geddes continued as a distributor for Bardahl until August 24, 1959, and that Bardahl is now estopped by that finding from asserting in this case that the distributorship terminated on July 28, 1959.

 The purpose of collateral estoppel by judgment is to preclude parties or their privies from relitigating an issue that has been finally determined by a court of competent jurisdiction after the party against whom the estoppel is claimed has had the opportunity to fairly and fully present his case. We have recently discussed the philosophy and the purpose of collateral estoppel by judgment in *Bordeaux v. Ingersoll Rand Co.,* 71 Wn. 2d 392, 429 P.2d 207 (1967). See also *Walsh v. Wolff,* 32 Wn.2d 285, 201 P.2d 215 (1949); 1B J. Moore, Federal Practice § 0.441(2), p. 3779 (2d ed.).

Henderson places great reliance on the landmark case of *Bernhard v. Bank of America Nat'l Trust & Sav. Ass'n,* 19 Cal. 2d 807, 122 P.2d 892 (1942), in which Chief Justice Traynor in dealing with the requirement of mutuality as applied to res judicata "laid it to rest," as one commentator said, "by a triumph of judicial statesmanship."[10]

---

[10]Brainerd Currie in 9 Stan. L. Rev. 281, 282 (1957), *"Mutuality of Collateral Estoppel: Limits of the Bernhard Doctrine,"* and in 53 Cal. L. Rev. 25 (1965) *"Civil Procedure: The Tempest Brews."*

Henderson urged in the trial court and urges here that under the *Bernhard* case and the many which have followed it, that privity and mutuality are no longer required in the modern concept of estoppel by judgment, and that even the frequently asserted rule that estoppel by judgment is to be used as a shield by a defendant, and not as a sword by a plaintiff, is, with some distinctions, no longer regarded as valid.[11]

Our own cases show prior determinations of the Department of Labor and Industries being used as res judicata both offensively and defensively in actions by employees against employers.[12]

We recognize that there are many cases where the issues of mutuality, privity, and the offensive-defensive distinction should not be permitted to obstruct the application of collateral estoppel by judgment. However, it is unnecessary to consider those issues in the present case, intriguing as they may be, because we are convinced that the trial court properly found collateral estoppel by judgment inapplicable. We would agree with the trial court for three basic reasons.

*First:* Certain findings and the judgment in the Geddes case are ambiguous and confusing, and not decisive of the issue as to the date of the termination of the Geddes distributorship.

Our interpretation of the findings and judgment in the Geddes case is that the trial court specifically recognized that, in the areas other than Brazil, Bardahl had terminated the Geddes distributorship on July 28, 1959. That was the reason it awarded him judgment in the sum of $19,849.97

---

[11]It is to be noted that Henderson was not a party in the Geddes case; that, as plaintiff, the only weapon in his legal arsenal on this appeal is his claim that Bardahl is estopped by the judgment and findings in the Geddes case to again litigate the issue of when the Geddes distributorship terminated.

[12]*Offensively: Miller v. St. Regis Paper Co.,* 60 Wn.2d 484, 374 P.2d 675 (1962); *Prince v. Saginaw Logging Co.,* 197 Wash. 4, 84 P.2d 397 (1932).

*Defensively: Shoopman v. Calvo,* 63 Wn.2d 627, 388 P.2d 559 (1964).

for profits on sales made direct to his subdistributors prior to the termination of the contract; and awarded him $12,821 as additional profits which he would have earned had he received a 90-day notice of termination instead of a 60-day notice.

In short, the trial court in the Geddes case regarded July 28, 1959, as the date of the termination in the Geddes distributorship, but because it found Geddes had not received adequate notice of the intent to terminate his distributorship he was permitted to recover the profits he would have made if he had received reasonable notice (90 days) of intent to terminate.

The only language used by the trial court in the Geddes findings which gives any support to Henderson's contention is finding No. 11, with reference to the Brazilian sales, which we have quoted in footnote 6. Recovery was permitted to Geddes of $1 per gallon on the 13,851 gallons of concentrate manufactured and sold in Brazil "during the period covered by plaintiff's [Geddes] contract." While Geddes' contract with Bardahl relative to Brazil limited him to only $1 a gallon on the Brazilian sales, no difference is pointed out with reference to Bardahl's right to terminate that distributorship when and as it did.

As indicated, the trial court in one part of the findings and judgment in the Geddes case clearly recognized July 28, 1959, as the termination of the distributorship. Any doubt cast upon that holding by the holding in another part of the findings and judgment, as to the profits lost in Brazil, could no more than make the judgment ambiguous and inconsistent—with July 28, 1959, being the termination date for all areas except Brazil for which no termination date was indicated. (The latest date for the termination of the distributorship, even under Henderson's contention, was August 24, 1959.) There is nothing to indicate any reason for such a variation. An ambiguous and inconsistent judgment should not be the basis for an estoppel by judgment. In 2 Orland, Wash. Prac., § 387 (2d ed.), p. 417, it is stated:

And, where, because of the ambiguity or indefiniteness of the verdict or judgment, the appellate court cannot say that the issue was determined in the prior action, collateral estoppel will not be applied as to that issue.

This is supported by *Hamm v. Camerota*, 48 Wn.2d 34, 290 P.2d 713 (1955); *Rufener v. Scott*, 46 Wn.2d 240, 280 P.2d 253 (1955); *Braley Motor Co. v. Northwest Cas. Co.*, 184 Wash. 47, 49 P.2d 911 (1935).

*Second:* The same issue was not necessarily decided in the Geddes and Henderson actions.

■ It is axiomatic that for collateral estoppel by judgment to be applicable, that the facts or issues claimed to be conclusive on the parties in the second action were actually and necessarily litigated and determined in the prior action. *Ira v. Columbia Food Co.*, 226 Ore. 566, 360 P.2d 622, 86 A.L.R.2d 1378 (1961); *The Evergreens v. Nunan* 141 F.2d 927 (2d Cir. 1944), 152 A.L.R. 1187.

The trial court in the instant case had to decide when the Geddes distributorship terminated, and the parties to the Henderson-Bardahl contract had a right to be heard on that issue. For the purposes of that contract, Henderson's right to a commission on the Geddes sales of concentrate was to end when the latter's distributorship terminated.

For the purposes of the Geddes-Bardahl-distributorship contract, Geddes' right to recover for lost profits continued, so the trial court found in the Geddes case even after the actual termination and for a period sufficient to total 90 days from the notice of intent to terminate, given on May 26, 1959. The trial court in that case was concerned with the question of what was a reasonable notice of intent to terminate prior to the actual termination.

*Third:* The claimed collateral estoppel by judgment would work an injustice on Bardahl. As to the commission claimed by Henderson on 10,063 gallons of Bardahl concentrate manufactured and sold in Brazil subsequent to August 24, 1959 (the date on which Henderson says that the Geddes distributorship was terminated), we have a situation where the finding in the Geddes case—that during the

period covered by the Geddes-Bardahl contract 13,851 gallons were manufactured and sold in Brazil—is manifestly an error. As we have indicated, the unchallenged testimony is that after the 3,788 gallons were manufactured and sold in March or April, 1959, no other Bardahl concentrate was manufactured and sold in Brazil until at least September (probably November), 1959. The appellant Henderson does not dispute this testimony, but says that it should not have been admitted because the trial court in the Geddes case had found that 13,851 gallons had been manufactured and sold while the Geddes contract was in effect.

■ This would be an $11,069.30 windfall for Henderson by estoppel, and a corresponding loss to Bardahl.

The Florida Supreme Court has said:

[T]his Court, among others, has gone so far as to hold that it will not invoke the doctrine of res adjudicata if to do so would work injustice. The propriety of such ruling can not be questioned when one reflects upon the fact that the primary purpose for which our courts were created is to administer justice. (*Beverly Beach Properties, Inc. v. Nelson*, 68 So.2d 604, 607, 41 A.L.R.2d 1071 (1953)).

Professor Currie says in an article in the California Law Review, heretofore cited in footnote 10,

No legal principle, perhaps least of all the principle of collateral estoppel, should ever be applied to work injustice. (p. 37)

It is generally recognized that the doctrine of res judicata (and this applies to that branch known as collateral estoppel by judgment) is not to be applied so rigidly as to defeat the ends of justice, or to work an injustice. *DiCarlo v. Angeloni*, 3 Cal. 2d 225, 44 P.2d 562, 99 A.L.R. 990 (1935). See 30A Am. Jur. *Judgments*, § 325.

Our conclusion is that the trial court in the present case properly held that the Geddes-Bardahl distributorship was terminated on July 28, 1959, and awarded to the plaintiff Henderson all the relief to which he was entitled.

On the cross-appeal, Bardahl makes four contentions:

1. *Claim for refund against Henderson:* Bardahl contends that it was entitled to a refund from Henderson of

$3,267 for commissions paid to him on 84 drums of concentrate, which Bardahl had sold to Geddes but which Bardahl subsequently had to buy back from him.

There seems to be merit to Henderson's contention that the defendant Bardahl International Corporation did not have such an assignment of this claim from Bardahl Manufacturing Corporation as would entitle it to maintain an action for the refund, or to use it as an offset. However, we prefer to dispose of the matter on the merits.

The trial court found, on the basis of the testimony of Bardahl's witness W. G. Simpson, that the repurchase of the 84 drums of concentrate from Geddes was for the manufacturing corporation's own purpose and that such a repurchase could not be made the basis of a claim for refund for the commissions paid Henderson by Bardahl. In discussing this issue, the trial court said:

> Mr. Simpson testified very forthrightly what happened. Now, we find this situation: These products were sold to Mr. Geddes and they were paid for and they belonged to Mr. Geddes. This is not a case where products were turned back for credit and products taken in place or anything of that sort. Mr. Simpson had to buy this fellow out, good or bad, to get rid of him. This was not a case of either obligation on the part of Mr. Bardahl to take them back nor a right of Mr. Geddes for any credits or anything of that sort. This was a straight buy out, as I see it, of products that Geddes may have allowed to become contaminated and things of that sort.

There seems to be no reason to disagree with the analysis of the trial court.

2. *Claim that no interest should be allowed on the items making up the judgment awarded Henderson:* Henderson's judgment for $8,583.30 was made up of items due him; and the dates on which Bardahl had received payment on each item was established.

■ The trial court correctly applied the law relative to interest, as laid down in *Mall Tool Co. v. Far West Equip. Co.,* 45 Wn.2d 158, 273 P.2d 652 (1954). On the items on which Henderson was allowed recovery, the evidence es-

tablished the number of gallons purchased; the dates on which payments were made by "Geddes or by some person acting by, through or under Geddes or a subdistributor of Geddes." All that was needed was simple arithmetic—a multiplication of the number of gallons sold by $1.10, and the computation of interest from the date Bardahl received the payment. Bardahl's further complex relationship with Geddes had no bearing on these specific items due Henderson.

3. *Parol testimony of Henderson's agreement to waive his commission on sales made in Brazil should have been admitted:*

We agree with Bardahl that a written agreement may be modified by a subsequent oral agreement between the parties.

■ The oral agreement, which Bardahl offered to prove, was prior to the execution of the written commission agreement of January 22, 1959, on which this action is based. The agreement is complete in itself and not ambiguous; there is no claim of accident, mistake or fraud. The trial court properly refused to admit parol testimony to vary the written agreement. *Thomesen v. Hales,* 52 Wn.2d 741, 328 P.2d 697 (1958).

4. *Judgment for $8,583.30 should be reduced by $4,166.88, the amount of the commissions on the Brazilian sales:*

This is closely related to the attempt to introduce evidence of an agreement by Henderson to waive his commissions on concentrate sold in Brazil. This is the commission on the 3,788 gallons of concentrate manufactured and sold in Brazil before the termination of the Geddes distributorship July 28, 1959. There is no evidence to sustain an agreement by Henderson to waive this commission.

On both the appeal and the cross-appeal the judgment appealed from is affirmed.

All Concur.