[No. 266-40894-1.    Division One—Panel 1.    August 17, 1970.]

JAMES G. GIBSON *et al., Appellants,* v. NORTHERN PACIFIC BENEFICIAL ASSOCIATION HOSPITALS, INC., *et al., Respondents.*

*Miracle & Pruzan* and *Hugh Miracle,* for appellants.

*Davies, Pearson, Anderson & Gadbow* and *Alvin A. Anderson,* for respondent Northern Pacific Beneficial Association Hospitals, Inc.

*Comfort, Dolack, Hansler & Billett* and *Allan R. Billett,* for respondent May.

JAMES, C. J.—James Gibson was involved in a minor automobile collision in downtown Seattle late one afternoon. He summoned a tow truck, and the driver let Gibson ride with him in the cab to the towing company's garage. While stepping out of the truck, Gibson accidentally fell and fractured his ankle.

Gibson was taken by ambulance to Virginia Mason Hospital in Seattle and then transferred to a Tacoma hospital operated by Northern Pacific Beneficial Association Hospitals, Inc. ("NPBA Hospital" in the remainder of this opinion). Although he was in pain because of the fracture, Gibson was completely lucid and coherent.

When Gibson arrived at NPBA Hospital at about 8:30 p.m., a nurse telephoned Dr. Charles May, a general practitioner on the staff of the hospital, and informed him of Gibson's arrival and of his fractured ankle. Dr. May directed that Gibson's ankle be splinted and elevated and that his breakfast be withheld. He further directed that Gibson be given a drug, Ananase, to reduce the swelling in his ankle and that he be given, as the hospital's records reflect, "Numorphan, 1 or 2 cc.'s as needed for pain, . . ." Numorphan is a narcotic about 10 times as potent as morphine. Gibson was given 1 cc of Numorphan immediately and another 2 cc's of the drug slightly more than 3 hours thereafter.

At 4:30 a.m. Dr. May was notified that Gibson was in a coma and breathing heavily. Gibson did not respond favorably to Dr. May's efforts to reverse the direction Gibson's symptoms had unexpectedly taken. As a result of some cause, Gibson sustained serious brain damage.

Gibson was later transferred to a nursing home. At that time he was incoherent and unable to walk. Through treatment at the University of Washington medical center he has improved somewhat but is still a very handicapped individual.

Before his injury Gibson was employed by the Northern Pacific Railway as a rate clerk. In connection with his employment he paid the premiums on a contract of insurance with the Benefit Association of Railway Employees. Under the policy Gibson was to receive $100 per month for life if he became totally and permanently disabled by accidental means. After Gibson suffered brain damage at NPBA Hospital a claim was made on his behalf for the $100 per month indemnity payments, but the insurer took the

position that Gibson's brain damage did not result from accident under the terms of the policy and refused payment.

Gibson brought an action in King County to compel the Benefit Association of Railway Employees to pay the monthly indemnity payments. (In the remainder of this opinion the King County suit will be referred to as the "insurance case.") The complaint in the insurance case alleged the existence of the contract, Gibson's permanent and total disability resulting from an accidental cause, and the insurer's refusal to pay.

Dr. May testified in the insurance case that prescribing Numorphan was "appropriate" and that the giving of some narcotic was, under the circumstances, necessary to relieve the pain in Gibson's ankle. Gibson's brain damage, according to Dr. May, was probably due either to a spontaneous cerebrovascular accident (a stroke) or to a stroke resulting from the release into Gibson's circulatory system of a fatty embolism from the marrow of the broken bone. Dr. May discounted the possibility that Gibson's injuries were the result of the use of Numorphan.

Another general practitioner, Dr. Jack Brown, testified that administration of Numorphan was necessary and proper under the circumstances but that the drug "was used improperly, . . ." in that Gibson had been "overdosed." Dr. Brown testified,

> I think he was obviously overdosed. . . . He was given one cc., or one and a half milligrams, to start with, and in less than the recommended interval of time was given a double dose. . . . In my practice and my knowledge, this is almost unheard of as far as sedating patients.

Gibson recovered a verdict and judgment against the insurer.

On the same day that Gibson filed suit in the insurance case he also commenced this action in Pierce County against Dr. May and NPBA Hospital to recover damages for their alleged medical negligence. After judgment was

entered in the insurance case, Dr. May and NPBA Hospital moved for the entry of a judgment summarily dismissing this action. They contended that the issue of medical malpractice had already been litigated in the insurance case and that the plaintiff's verdict in that case reflected the jury's determination that Gibson's brain damage was caused solely by his accidental fall, without the intervening negligence of either Dr. May or the hospital. Invoking the doctrine of collateral estoppel by judgment, Dr. May and the hospital urged that Gibson should not be permitted to recover a verdict by convincing the jury in the insurance case that his injuries *were not* caused by their negligence and then recover a second verdict by convincing a jury in this action that his injuries *were* caused by their negligence. From the entry of the order granting summary judgment of dismissal, Gibson appeals.

Res judicata and collateral estoppel are closely related judicial doctrines. The difference between the two was noted in *Bordeaux v. Ingersoll Rand Co.*, 71 Wn.2d 392, 395, 429 P.2d 207 (1967):

[R]es judicata is the more comprehensive doctrine, identifying a prior judgment arising out of the same cause of action between the same parties, whereas a collateral estoppel relates to and bars relitigation on a particular issue or determinative fact.

Speaking of the precise doctrine involved in the present appeal, our Supreme Court observed that

The purpose of collateral estoppel by judgment is to preclude parties or their privies from relitigating an issue that has been finally determined by a court of competent jurisdiction after the party against whom the estoppel is claimed has had the opportunity to fairly and fully present his case.

*Henderson v. Bardahl Int'l Corp.*, 72 Wn.2d 109, 115, 431 P.2d 961 (1967).

Until recently, the doctrine of collateral estoppel had always been considered in this state to apply only in instances in which there is an identity of parties or their privies in both the prior and subsequent actions. Conse-

quently, a stranger to a prior action could not assert the doctrine of collateral estoppel by judgment to prevent relitigation of an issue already decided. *See, e.g., Bordeaux v. Ingersoll Rand Co., supra; Owens v. Kuro,* 56 Wn.2d 564, 354 P.2d 696 (1960); *State ex rel. First Nat'l Bank v. Hastings,* 120 Wash. 283, 207 P. 23 (1922). The rule requiring identity of the parties or their privies in both actions is referred to as the requirement of mutuality. If the requirement were imposed in this case the judgment summarily dismissing the malpractice suit against Dr. May and NPBA Hospital would clearly have to be reversed, for neither the doctor nor the hospital was a party to the insurance case.

However, the court in *Henderson v. Bardahl Int'l Corp., supra* at 116 suggested in dictum that the requirement of mutuality might be dispensed with in an appropriate case:

> We recognize that there are many cases where the issues of mutuality, privity, and the offensive-defensive distinction should not be permitted to obstruct the application of collateral estoppel by judgment.

The dictum in *Henderson* became the rule of decision in another division of this court recently in *Lucas v. Velikanje,* 2 Wn. App. 888, 471 P.2d 103 (1970). The statement in *Henderson* and its application in *Lucas* reflect a growing trend in American jurisdictions toward abandoning unvarying adherence to the doctrine of mutuality. *See* 44 Wash. L. Rev. 449 (1969); Annot., 31 A.L.R.3d 1044 (1970). The trend toward abandoning the requirement began in earnest with Mr. Justice Traynor's vanguard opinion in *Bernhard v. Bank of America Nat'l Trust & Sav. Ass'n,* 19 Cal. 2d 807, 122 P.2d 892 (1942), but the mutuality requirement had been criticized for more than a century.[1]

---

[1] "Another curious rule is, that, as a judgment is not evidence *against* a stranger, the contrary judgment shall not be evidence *for* him. If the rule itself is a curious one, the reason given for it is still more so:—'Nobody can take benefit by a verdict, who had not been prejudiced by it, had it gone contrary:' a maxim which one would suppose to have found its way from the gaming table to the bench. If a party be benefited by one throw of the dice, he will, if the rules of fair

■ Even if, in a proper case, the requirement of mutuality need not be imposed, collateral estoppel may not be applied to prevent litigation of an issue unless it is certain that the same issue has already been litigated and decided.

It is axiomatic that for collateral estoppel by judgment to be applicable, that the facts or issues claimed to be conclusive on the parties in the second action were actually and necessarily litigated and determined in the prior action.

*Henderson,* 72 Wn.2d at 118.

An ambiguous and inconsistent judgment should not be the basis for an estoppel by judgment. In 2 Orland, Wash. Prac., § 387 (2d ed.), p. 417, it is stated:

And, where, because of the ambiguity or indefiniteness of the verdict or judgment, the appellate court cannot say that the issue was determined in the prior action, collateral estoppel will not be applied as to that issue.

*Henderson,* 72 Wn.2d at 117.

The issue in the present appeal, then, is whether we can conclude without reservation that the jury in the insurance case determined upon competent evidence that Gibson's serious injuries were not caused by the medical negligence of Dr. May or NPBA Hospital. If we cannot so conclude, the judgment dismissing Gibson's malpractice suit against the physician and the hospital must be reversed.

A finding of medical negligence must be based upon a determination by the trier of fact that the physician's treatment fell below the standard of skill and care expected of the average practitioner in the class to which the physician

---

play are observed, be prejudiced by another: but that the consequence should hold when applied to justice, is not equally clear. This rule of *mutuality* is destitute of even that semblance of reason, which there is for the rule concerning *res inter alios acta.* There is reason for saying that a man shall not lose his cause in consequence of the verdict given in a former proceeding to which he was not a party; but there is no reason whatever for saying that he shall not lose his cause in consequence of the verdict in a proceeding to which he *was* a party, merely because his adversary was not." 7 Works of Jeremy Bentham 171 (J. Bowring ed. 1843).

belongs. Medical negligence was defined recently in *Hayes v. Hulswit,* 73 Wn.2d 796, 797, 440 P.2d 849 (1968):

In actions such as this:

(1) Plaintiff must establish by competent evidence the standard and degree of care and skill expected of the average medical or dental practitioner, in the class to which defendant belongs, acting in the same or similar circumstances. As this court recently said:

This standard of care is that established in an area coextensive with the medical and professional means available in those centers that are readily accessible for appropriate treatment of the patient. *Pederson v. Dumouchel,* 72 Wn.2d 73, 431 P.2d 973 (1967).

(2) Plaintiff's evidence must establish that defendant failed to meet this standard of care.

In a still more recent case, *Samuelson v. Freeman,* 75 Wn.2d 894, 454 P.2d 406 (1969), the Supreme Court suggested that a medical malpractice jury instructed in accordance with WPI 105.01, as modified by the rule in *Pederson v. Dumouchel,* 72 Wn.2d 73, 431 P.2d 973, 31 A.L.R.3d 1100 (1967), would be instructed "with fairness and reasonable brevity." *Samuelson v. Freeman, supra* at 897. The pattern instruction provides that

A [general practitioner] owes to his patients a duty to comply with the recognized standard of practice for his profession prevailing at the time of the treatment in question. This means that he must possess and apply that degree of skill and learning and exercise that degree of care which is ordinarily possessed and exercised by reasonably skilled, learned and careful members of the same profession practicing in the same or similar communities at that time. Failure to apply such skill and learning or to exercise such care is negligence.

The degree of care, skill and learning which constitutes the recognized standard of practice [and any claimed deviation therefrom] [which involves matters not generally understood by those who are not trained in that profession] must be proved by testimony of members of that profession.

The holding in *Pederson v. Dumouchel, supra,* would require that the instruction be modified to broaden the local-

ity standard to specify a geographical area coexistence with the medical and professional means available to the practitioner in those centers readily accessible to him for treatment of his patients.

An examination of the instructions given in the insurance case reveals that the jury was not directed to determine whether Dr. May's treatment fell below the degree of skill and care expected of the average general practitioner. *See Hayes v. Hulswit, supra.* The instructions asked the jury whether Dr. May's medical treatment was "necessary and proper" and whether Gibson's injuries were caused accidentally, "without the intervention of any force operating or working actively from a new and independent source."[2] The terms "necessary" and "proper" were not defined for the jury, nor was the jury told what it meant for an injury to result "without the intervention of any force operating or working actively from a new and independent source."

---

[2] The critical instructions are as follows:

"You are instructed that an accidental injury is considered in law to have caused a permanent and total disability if such injury sets in motion a train of events which brings about such result without the intervention of any force operating or working actively from a new and independent source." Instruction 4.

"You are instructed that when an insured undergoes medical treatment for the purpose of curing an injury caused by accident or accidental means, covered by an accident insurance policy, the policy also covers additional or aggravated harm or injury sustained as the consequence of the medical treatment, but only if the medical treatment is necessary and proper." Instruction 6.

"In the event that you find that the plaintiff James Gibson's condition has resulted from his fall on December 5, 1964, without the intervention of any force operating or working actively from a new and independent source, then you shall return a verdict for the plaintiff.

"If, on the other hand, you find that the plaintiff James Gibson's condition does not result from his fall on December 5, 1964 without the intervention of any force operating or working actively from a new and independent source, then you shall return a verdict for the defendant.

"Also, if you find that the medical treatment given to the plaintiff James Gibson within the twenty-four hours following his hospitalization in Tacoma was either not necessary or not proper and if you further find that his present disability is the result of such unnecessary or improper treatment you must return a verdict for the defendant." Instruction 7.

We cannot say that when the jury determined that Dr. May's treatment was "necessary and proper" and that Gibson's injuries did not result from any "new and independent source" that it therefore found that the treatment was not negligently administered. Treatment rendered may be considered "necessary and proper," but it may still have been negligently administered. Under the instructions in the insurance case the jury resolved an issue of cause but not an issue of fault. The instructions bear out Gibson's assertion in his reply brief that his "sole function was to show an unbroken chain of causation between the fractured leg, through its treatment by Dr. May and NPBA hospital personnel, to [Gibson's] ultimate brain damage."

We cannot conclude without reservation that the jury in the insurance case determined that Gibson's injuries were not caused by the negligence of Dr. May or NPBA Hospital. Accordingly, the judgment dismissing Gibson's suit against the physician and the hospital is reversed.

FARRIS and SWANSON, JJ., concur.

Petition for rehearing denied September 14, 1970.
Review denied by Supreme Court October 7, 1970.