**Howard W. LANGE, Plaintiff,**

v.

**Albert HEGLUND, Jr., et al.,
Defendants.**

**No. 565–73C2.**

United States District Court,
W. D. Washington.

April 25, 1974.

Robert W. McKisson, Beresford, Booth, Lehne & McKisson, Seattle, Wash., for plaintiff.

William D. Cameron, Williams, Lanza, Kastner & Gibbs, Seattle, Wash., for defendants Heglund.

Peter D. Byrnes, Bogle & Gates, Seattle, Wash., for defendant Paulsell.

Stephen E. DeForest, Riddell, Williams, Ivie, Bullitt & Walkinshaw, Seattle, Wash., for defendant Smith Barney & Co., Inc.

## MEMORANDUM DECISION RE COLLATERAL ESTOPPEL AND GRANTING PARTIAL SUMMARY JUDGMENT

BOLDT, Senior District Judge.

Plaintiff has moved for partial summary judgment against defendants as to certain Findings of Fact and Conclusions of Law entered in the Washington State civil action of Ginsberg, et al v. Heglund, et al, *King County Superior Court Cause No. 826781*, entered February 22, 1972, on the basis of the doctrine of collateral estoppel by judgment. The Superior Court case was a suit by different plaintiffs against the same defendants as in this court. Whether plaintiff in this case may rely upon a judgment obtained by different plaintiffs against the same defendants as the basis for partial summary judgment presents a two-fold question, if the requirements for application of the doctrine of collateral estoppel are otherwise met:

(1) Whether mutuality of parties is required for application of the doctrine of collateral estoppel; and

(2) Whether collateral estoppel may be used offensively by plaintiff.

A landmark case dealing with mutuality, although the opinion therein speaks of res judicata or "claim preclusion" rather than collateral estoppel or "issue preclusion," is Bernhard v. Bank of America Nat'l Trust & Sav. Ass'n, 19 Cal.2d 807, 813, 122 P.2d 892, 895 (1942), in which Justice Traynor abandoned the requirement of mutuality of parties and set forth three criteria to be considered:

(1) Was the issue decided in the prior adjudication identical with the one presented in the action in question?

(2) Was there a final judgment on the merits?

(3) Was the party against whom the plea is asserted a party, or in privity with a party, in the prior adjudication? In dicta the Washington Supreme Court recognized the trend toward elimination of the mutuality requirement begun with Bernhard in Henderson v. Bardahl International Corp., 72 Wash.2d 109, 115, 431 P.2d 961, 967-8 (1967), which added a fourth question that must also be answered in the affirmative:

(4) Will the application of the doctrine not work an injustice on the party against whom the doctrine is to be applied?

Although collateral estoppel was not applied in the *Henderson* case because the issues were not the same as those in the prior case, the State Supreme Court made the following declaration:

> We recognize that there are many cases where the issues of mutuality, privity, and the offensive-defensive distinction should not be permitted to obstruct the application of collateral estoppel by judgment. 72 Wash.2d at 116, 431 P.2d at 966.

Based upon that language the Washington Courts of Appeal has recognized that the doctrine of collateral estoppel

may be applied where mutuality of parties does not exist. Lucas v. Velikanje, 2 Wash.App. 888, 471 P.2d 103 (1970) (collateral estoppel applied without mutuality of parties); Gibson v. Northern Pacific Ben. Ass'n. Hosp., Inc., 3 Wash.App. 214, 473 P.2d 440 (1970) (estoppel not applied because issue not identical, but appellate court recognized mutuality of parties was not required). Federal courts have frequently recognized that mutuality is not a prerequisite to collateral estoppel since the decision of Judge Hastie in Bruszewski v. United States, 181 F.2d 419 (3rd Cir.), cert. denied 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950).

■ No opinion of the Washington Appellate or Supreme Court recognizing offensive use of collateral estoppel has been cited to, or independently discovered by, this court. However, based upon the previously quoted language from *Henderson*, this court is of the opinion that the Washington Supreme Court would recognize offensive use of the doctrine of collateral estoppel in an appropriate case. State courts (e. g. Nevarov v. Caldwell, 161 Cal.App. 2d 762, 327 P.2d 111 (1958)) and federal courts applying state law (e. g. Mackris v. Murray, 397 F.2d 74 (6 Cir. 1968), applying Michigan law) which have refused to apply the collateral estoppel doctrine affirmatively have generally done so in single accident personal injury cases involving separate suits by multiple plaintiffs, upon the rationale that it would be unjust to allow subsequent plaintiffs to rely on the establishment of liability against defendant by a different plaintiff. However, offensive use of the doctrine was allowed by Judge Hall in just such a case, United States v. United Air Lines, Inc., 216 F.Supp. 709 (D.Nev. 1962), aff'd sub nom., United Airlines,

Inc. v. Wiener, 335 F.2d 379 (9th Cir.), cert. dismissed, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964), which case also lacked mutuality of parties. That case involved an airline crash, and the court found that all plaintiffs were so similarly situated that the liability of defendants was the same as to all plaintiffs. The 9th Circuit Court of Appeals specifically adopted the District Court's treatment of the issue of mutuality, and by affirmance of that part of the trial court's opinion inferentially approved the offensive use of collateral estoppel (335 F.2d at 404). In Zdanok v. Glidden Co., 327 F.2d 944, 955 (2nd Cir. 1964), a contract rather than negligence case, Judge Friendly's opinion applied the collateral estoppel doctrine offensively, treating the offensive-defensive distinction as a rule of thumb rather than a settled principle of law.

■ Upon the record in this case, this court is convinced that lack of mutuality of parties and attempted offensive use of the doctrine should not prevent application of collateral estoppel against these defendants on plaintiff's motion for partial summary judgment. To the extent set forth below the issues decided in the prior adjudication were identical with those presented in this case. There was a final judgment in the previous case on the merits. The parties against whom the plea is asserted in this action were parties in the prior adjudication. Application of the doctrine in this case will not work an injustice on the parties against whom the doctrine is to be applied.

Therefore, this court finds and holds that plaintiff's motion for summary judgment is granted to the extent of the following Findings of Fact (F.F.) and Conclusions of Law (C.L.)

F.F.–V. "At all times up to the end of Unique's [Unique Zipper Distributing Co., Inc.] fiscal year ending January 31, 1967, Unique experienced large annual operating losses. On the basis of what they learned of Unique's financial condition, the plaintiffs formed the opinion, in or about 1965 and 1966 that their shares were virtually worthless and they wrote off their original investment for tax purposes. They

did not think much more about their shares in Unique until plaintiff Berman received a telephone call at his home, in or about August of 1967, from defendant Paulsell, calling from San Francisco, California, inquiring about purchasing shares in Unique. Defendant Paulsell orally stated to Berman that he was employed by Smith, Barney & Co. as a stockbroker and stated further that he was inquiring as to the purchase on behalf of clients whose identity he could not disclose. He proposed and offered to purchase the shares of Berman and Ginsberg at $2 per share. The following day, Berman discussed the matter with Ginsberg. Within a few days after Paulsell first contacted Berman, the two again conversed by telephone and Berman told Paulsell that he and Ginsberg were willing to sell their shares for the offered price of $2 per share. Shortly thereafter, Ginsberg telephoned Paulsell at the offices of Smith, Barney & Co. in San Francisco, and informed him that he believed he also owned the shares represented by the "Gregor" certificate and was willing to sell them also; Paulsell stated his desire to include these shares in the sale and he informed Ginsberg as to the method of endorsement for transfer. Paulsell then sent a cashier's check for the sum of $1,400 and two stock power forms to Berman under a covering letter, dated August 11, 1967, on Smith, Barney & Co. stationery, and directed Berman to send the Berman-Ginsberg certificate and the Gregor certificate (totaling 1,900 original shares of Unique, but representing 691 shares according to current capitalization) and the stock powers by separate return mail to the Smith, Barney & Co. office in San Francisco. Berman cashed the $1,400 check and delivered to Ginsberg his share thereof. Berman mailed the certificates and the stock powers to the Smith, Barney & Co. office in San Francisco. Berman and Ginsberg believed that Smith, Barney & Co., in some manner was involved in the purchase transaction and in entering into the sale, they relied upon its status as a reputable stockbrokerage firm.

F.F.–VIII "In the early months of 1967, Unique began to experience its first net profits. Sales had been and then were on the increase; in February of 1967, Heglund consummated a new agreement with Unique's Japanese supplier of zippers, cutting the landed cost of acquisition to one-third ($\frac{1}{3}$) the previous cost; in the latter part of May, 1967, Heglund went to West Warren, Massachusetts, to carry on serious discussions with William E. Wright and Sons, a major firm in the notions industry, regarding the prospect of the latter company's purchase of Unique.

F.F.–IX "For the annual meeting of shareholders of Unique, held May 19, 1967, Heglund instructed Unique's employees not to disclose to shareholders any of the following significant company affairs occurring since January 31, 1967; (1) the amount of increased sales, (2) experience of first net profits from operations, (3) the new zipper supply contract and (4) the prospect of acquisition by William E. Wright and Sons. There was no general release of information to shareholders or the public as to any of such matters during the year 1967.

At the May, 1967, shareholders' meeting, at the request of Heglund, Paulsell made a motion that the remaining authorized but unissued shares of Unique (25,000 shares) be made the subject of stock options granted to personnel of Unique as designated by the board of directors at a price of $1 per share. The notice to shareholders of this meeting gave no indication that such action would take place at the meeting. At a directors meeting on June 3, 1967, the directors of Unique granted the options for such shares to themselves and certain officers; Heglund received an option for 8,800 shares; he paid for such shares by reducing Unique's indebtedness to him by $8,800.00.

F.F.–X "Paulsell and Heglund were sophisticated about the devices of acquisition and merger being utilized for expansion by corporations in or about 1967. They believed that financial gains with respect to Unique could be made from ownership of Unique stock which would be exchanged for more marketable stock in a larger, publicly held company. At or about the time of the May, 1967, shareholders' meeting, Heglund allowed Paulsell to have access to Unique's records in order to learn names and addresses of shareholders and amounts of shares held by them. Paulsell and Heglund came to an understanding whereby Paulsell would solicit shares from minority shareholders and, as to those acquired, he would equally divide them with Heglund, who would reimburse him for his cost of acquisition. Thereafter Paulsell contacted minority shareholders and purchased shares in Unique from twelve (12 of them. The stock transfer records of Unique reflect that transfer entries were made from June 5, 1967, through October 27, 1967, with respect to the following transferors and transferees:

| | | |
|---|---|---|
| June, 1967 | 18 shares from Mrs. George LaBour, Jr. | 9 shares to Paulsell |
| August, 1967 | 545 shares from Walter Heath, 182 and 509 shares from plaintiffs | 618 shares to Paulsell<br>618 shares to Heglund |
| Sept. 1967 | 727 shares from J. D. Hone, 236 shares from Ralph W. Lamb | 482 shares to Paulsell<br>381 shares to Heglund<br>100 shares to Heglund's secretary |
| Sept. 1967 | 1,700 shares from Mr. & Mrs. Roland Leonard | 850 shares to Paulsell<br>850 shares to Heglund |
| Sept. 1967 | 266 shares from James Adams, 727 shares from Howard Lange, 364 shares from Puget Sound National Bank, 181 shares from W. H. Martens | 769 shares to Paulsell<br>769 shares to Heglund |
| Oct. 1967 | 3,112 shares from Monte G. McKenzie | 1,045 shares to Paulsell<br>1,033 shares to Heglund<br>1,034 shares to Jim L. Buck (a director) |

As a result of the above transfers, Paulsell received 3,773 shares and Heglund received 3,660 shares. Paulsell paid the shareholders for the shares purchased and Heglund reimbursed Paulsell in an amount equal to Paulsell's cost of the shares transferred to Heglund. When plaintiffs were solicited and sold their shares, the defendants Paulsell and Heglund failed to inform them of the following material facts which were known to them but unknown to the plaintiffs: (1) Unique was then experiencing increased sales and its first operating net profits; (2) the existence of the new zipper supply contract; (3) the pending discussions with William E. Wright and Sons regarding merger and (4) the identity of the actual purchasers being Paulsell and Heglund. Each of these facts was material to the plaintiffs' decision as to whether to sell and had the plaintiffs known such facts, they would not have sold their stock at that time.

C.L.-IV "The conduct of Paulsell and Heglund, in acquiring the 691 shares from the plaintiff, was in violation of RCW 21.20.010 and the evidence with respect thereto was clear, cogent and convincing. Heglund, as president and a director of Unique, owed a fiduciary duty when purchasing the plaintiffs' stock to disclose his identity as one of the purchasers and to disclose the material inside information with respect to the value of the shares and the condition of Unique which was not otherwise available to "outsiders"; and he failed to do so; Paulsell, by obtaining inside information from Heglund and, in acquiring the shares of the plaintiffs under the facts above mentioned, owed to the plaintiffs the duties of disclosing to him the identity of the purchasers and the inside information of which he was aware; he also failed to comply with these duties. Paulsell also affirmatively misrepresented that he was purchasing for "a client" of his employer, which representation was material and reasonably relied upon by the plaintiffs.

C.L.-V "In dealing with the plaintiffs, Paulsell had apparent authority to be acting for and on behalf of defendant Smith, Barney & Co. and from the apparent circumstances, the plaintiffs were entitled to and did reasonably rely on such apparent authority in entering into the transaction. It is immaterial that Paulsell was not actually acting for Smith, Barney & Co. and that Smith, Barney & Co. was not benefited in any way."

---

Excepting only those portions personally applicable to the situation of the plaintiffs in *Ginsberg,* these Findings of Fact and Conclusions of Law are applicable to the present case under the doctrine of collateral estoppel by judgment.