951 P.2d 782 (1998)
134 Wash.2d 437
Richard RENINGER and Joanne Reninger, husband and wife; and William Cohen, Petitioners,
and Claire L. Thompson Cohen, Plaintiff,
v.
STATE of Washington DEPARTMENT OF CORRECTIONS; Robert Shepherd and Robin Shepherd, husband and wife, and their marital community; Allen Scamahorn and Margarette Scamahorn, husband and wife, and their marital community; Don Daniel and Leota Daniel, husband and wife, and their marital community, Respondents,
and William Callahan and Sharon Callahan, husband and wife, and their marital community; Jim Spaulding and Jane Doe Spaulding, husband and wife, and their marital community, Defendants.
No. 63661-3.
Supreme Court of Washington, En Banc.
Argued June 25, 1996.
Decided February 26, 1998.
*783 Stephen Smith, Bellevue, for Petitioners.
Christine O. Gregoire, Atty. Gen., Michael P. Lynch, Asst. Atty. Gen., Olympia, for Respondents.
Burgess, Fitzer, Leighton & Phillips, John Kugler, Tacoma, amicus curiae on behalf of Washington Ass'n of Prosecuting Attorneys.
TALMADGE, Justice.
We are asked in this case to decide if state correctional officers who were disciplined through the State's personnel process can, after losing their appeals of that discipline before the State Personnel Appeals Board (PAB), state in superior court claims for wrongful constructive discharge or tortious interference with a business expectancy. We hold those officers do not have a cause of action for wrongful constructive discharge under Washington law on these facts and collateral estoppel bars their tortious interference claim. We reverse the trial court's judgment and remand the case for entry of an order dismissing the officers' claims with prejudice.

*784 ISSUES
1. Do the officers state a claim for wrongful constructive discharge where they fail to prove they were constructively terminated in contravention of public policy?
2. Are the officers collaterally estopped from asserting a claim of tortious interference with a business expectancy where they litigated their discipline administratively in the state personnel process and the Personnel Appeals Board ultimately ruled against them?

FACTS
William Cohen began with the Department of Corrections (DOC) in 1975 at the Washington Corrections Center in Shelton. While at Shelton he was part of the statewide Emergency Response Team, which the Department of Corrections used to quell disturbances in state prisons. He was involved in terminating the riots at the Walla Walla prison in 1978-79. As a result of his Emergency Response Team activities, he was known and disliked by prisoners statewide. He claimed to have received injury and death threats during his time at the Shelton facility. He became a lieutenant in 1981 and transferred to McNeil Island Correctional Center (McNeil). He was qualified as a master firearms instructor and a sniper. He became the commanding officer of the McNeil Island Correctional Center Emergency Response Team (ERT).
Richard Reninger became a state correctional officer in 1981 when the Department of Corrections took over the federal penitentiary on McNeil Island. Prior to that, Reninger had been an employee of the Federal Bureau of Prisons. He became a member of Cohen's ERT at McNeil, and in 1988 was appointed Armory Sergeant. His duties as Armory Sergeant included maintaining and accounting for firearms and equipment.
On October 18, 1988, Reninger and Cohen trained other correctional officers for weapons recertification. To conduct the training, Reninger and Cohen removed weapons and ammunition from the armory and transported the equipment and the trainees to the firing range. At the range, they first moved the equipment into the range office and later took the equipment to the range for the actual training. While the weapons were not in use, they were kept in the range office. The standard procedure for the training session was, once the class ended, all weapons were moved back to the vehicle and the range office was cleared of any weapons. The group would then drive back to the armory and move all the weapons and ammunition back into the armory. Reninger and Cohen testified they properly returned and secured the firearms that day.
However, when Reninger returned to the armory on Monday, October 24, 1988, he noticed three shotguns were missing from their slots. After searching for the shotguns, Reninger called Correctional Captain Allen Scamahorn. Captain Scamahorn summoned Reninger to his office and informed him that Captain Daniel had found the three shotguns at the range office.
Cohen and Reninger denied leaving the shotguns unsecured at the range office. However, on October 24, 1988, Captain Daniel filed employee conduct reports against each, alleging on Saturday, October 22, 1988, he looked through the window of the range office, saw the barrel of a shotgun, entered the building, and discovered the three shotguns.
McNeil Superintendent William Callahan, in his capacity as Administrative Reviewer, conducted an investigation. As a result of his investigation, he notified Cohen and Reninger by letter dated January 23, 1989 of his conclusions that they had neglected their duty, were inefficient, and were guilty of gross misconduct in failing properly to account for the shotguns. He temporarily demoted both of themCohen from Correctional Lieutenant to Correctional Sergeant, and Reninger from Correctional Sergeant to Correctional Officerwith an accompanying reduction in pay, for a period commencing February 10, 1989, and ending June 29, 1989. He also reassigned them to duties at a segregation unit at McNeil.
Reninger and Cohen appealed their demotions to an administrative hearing examiner. In proceedings before the hearing examiner, *785 both Cohen and Reninger were represented by counsel, as was the DOC; both counsel gave opening and closing statements; both parties called and cross-examined witnesses who appeared and testified under oath; both Cohen and Reninger were afforded an opportunity to examine DOC documents and admit exhibits; both counsel were afforded an opportunity to make objections and receive rulings on them by the hearing examiner, who was a licensed attorney; both counsel were given the opportunity to submit hearing memoranda; and both counsel conducted formal depositions under oath prior to the hearing. The examiner decided against them. Cohen and Reninger then appealed that decision to the PAB, where another hearing was held in February 1990.
Before the PAB, Reninger and Cohen argued the charges resulted from a conspiracy by other officers to implicate them for leaving the shotguns unattended. The PAB found against them, noting Cohen and Reninger failed to account for the weapons after the training was completed; there was no evidence that anyone else had access to the weapons during the time period in question; and there was no evidence of collusion by other officers to implicate Cohen and Reninger. The PAB concluded Cohen and Reninger committed gross misconduct and that the four-and-one-half-month demotions were appropriate. Cohen and Reninger appealed the PAB decision to the superior court, but that appeal was dismissed.[1]
Reninger and Cohen took sick leave commencing January 23, 1989. Because they alleged they would come into potentially hazardous contact with inmates in their new assignments, and they feared for their safety, both officers resigned in March 1989 rather than accept the specific new assignments.[2]
In June 1990, Cohen and Reninger filed a complaint in the Pierce County Superior Court against DOC, Callahan, Scamahorn, Daniel, and Shepherd alleging (1) DOC wrongfully terminated their employment by wrongful constructive discharge in reassigning them to unreasonably hazardous duties; (2) their fellow officers tortiously interfered with their employment by setting them up for undeserved discipline for alleged failure properly to secure firearms; and (3) the tort of outrage.
The defendants moved for summary judgment claiming Cohen and Reninger's exclusive remedy was under civil service law, which precluded a claim of wrongful constructive discharge, and the employees were collaterally estopped from asserting facts contrary to those found by the PAB relating to the tortious interference claim. The trial court dismissed several claims, but denied the motion to dismiss the wrongful constructive discharge claim against DOC, and the outrage and tortious interference claims against the individual defendants. The trial court also granted the officers' motion to exclude any evidence or testimony regarding the discipline by the PAB, but denied the defendants' motion to exclude any reference to the proceedings on the officers' unemployment compensation claim before the Department of Employment Security.
The jury rendered a verdict in favor of the officers against the defendants except Callahan[3] on constructive wrongful discharge and tortious interference, but not on the outrage claim. The verdicts totaled $537,307. The trial court also awarded attorney fees *786 and costs pursuant to RCW 49.48.030 in the amount of $144,922.80. The defendants appealed the judgment on the verdict of the jury to the Court of Appeals. The officers did not cross-appeal the denial of their outrage claim.
The Court of Appeals reversed the judgment on the verdict of the jury, finding Reninger and Cohen had failed to state a claim for constructive wrongful discharge because civil service remedies for a claim of improper work assignment are exclusive, and because the officers were collaterally estopped by the PAB findings to deny they had been involved in misconduct. The Court of Appeals also applied collateral estoppel to the tortious inference claim. Reninger v. Department of Corrections, 79 Wash.App. 623, 901 P.2d 325 (1995). Reninger and Cohen petitioned for review, which we granted.

ANALYSIS
A. CONSTRUCTIVE WRONGFUL DISCHARGE
1. Civil Service Exclusive Remedy
DOC argues initially that any claim by the officers is barred because the State's Civil Service statutes constitute the exclusive remedy for any and all claims an employee covered by civil service may have against the State or other employees covered by civil service.
Other states have held civil service remedies to be exclusive. In Devine v. City of Des Moines, 366 N.W.2d 580, 582 (Iowa 1985) (quoting Iowa Code Ann. § 400.18 (West 19__)), the Iowa Supreme Court considered language similar to RCW 41.06.010 from the Iowa civil service law: "`No person holding civil service rights as provided in this chapter shall be removed, demoted, or suspended arbitrarily, except as otherwise provided in this chapter.'" The court held this language provided the "sole means by which the propriety of a civil service employee's dismissal may be determined."
Other states interpreting their civil service law as the exclusive remedy for civil service employees in the absence of a specific exclusivity provision include California (Valenzuela v. State, 194 Cal.App.3d 916, 240 Cal.Rptr. 45, 48-49 (1987)); Kansas (Gray v. Jenkins, 183 Kan. 251, 326 P.2d 319, 326 (1958)); Mississippi (Scott v. Lowe, 223 Miss. 312, 78 So.2d 452 (1955)); Tennessee (Wallace v. Neal, 191 Tenn. 240, 232 S.W.2d 49 (1950)); Vermont (Smith v. Highway Bd., 117 Vt. 343, 91 A.2d 805 (1952)); and Wisconsin (Castelaz v. City of Milwaukee, 94 Wis.2d 513, 289 N.W.2d 259, 267 (1980)). See also Micone v. Town of Steilacoom Civil Serv. Comm'n, 44 Wash.App. 636, 643 n. 2, 722 P.2d 1369, review denied, 107 Wash.2d 1010 (1986); accord Albright v. State, 65 Wash.App. 763, 768, 829 P.2d 1114 (1992); White v. State, 131 Wash.2d 1, 929 P.2d 396 (1997).
While RCW 41.06 and WAC Title 356 provide comprehensive rules governing the selection, continued employment, discipline, and discharge of state employees and the remedies afforded state employees, we do not need to reach the exclusive remedy issue here because, in this case, Reninger and Cohen have failed to state claims for constructive wrongful discharge or tortious interference.
2. Wrongful Discharge and At-Will Employees
DOC argues the doctrines of wrongful discharge or constructive wrongful discharge do not apply to employees who are not terminable at-will. Reninger and Cohen, given their civil service status, were not terminable at-will employees. Indeed, our case law has questioned the viability of such a tort where other relief is available to an affected employee. See, e.g., Micone v. Town of Steilacoom Civil Serv. Comm'n, 44 Wash.App. 636, 643 n. 2, 722 P.2d 1369 (questioning "whether the doctrine of constructive discharge even applies to employment governed by civil service rules"), review denied, 107 Wash.2d 1010 (1986); Albright v. Department of Social and Health Servs., 65 Wash.App. 763, 768-69, 829 P.2d 1114 (1992) (same).
We do not reach this issue because the officers fail to state a claim for wrongful constructive discharge under our cases.
*787 3. Officers Fail to State Wrongful Constructive Discharge Claim
Under the common law, an employer in Washington could discharge an employee with or without cause, absent an agreement to the contrary. Roberts v. Atlantic Richfield Co., 88 Wash.2d 887, 891, 568 P.2d 764 (1977). In Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 685 P.2d 1081 (1984), we first recognized an exception to this general terminable-at-will rule, holding that a cause of action for the tort of wrongful discharge will lie where "the discharge of [an] employee contravenes a clear mandate of public policy." Thompson, 102 Wash.2d at 232, 685 P.2d 1081. We have interpreted the cause of action narrowly. White v. State, 131 Wash.2d 1, 19-20, 929 P.2d 396 (1997) (court declines to recognize cause of action for wrongful transfer of state employee). In determining whether a clear mandate of public policy has been violated, we consider "whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme." Thompson, 102 Wash.2d at 232, 685 P.2d 1081 (quoting Parnar v. Americana Hotels, Inc., 65 Haw. 370, 652 P.2d 625, 631 (1982)). What qualifies as a clear mandate of public policy is a question of law. Gardner v. Loomis Armored, Inc., 128 Wash.2d 931, 937, 913 P.2d 377 (1996).
Reninger and Cohen have not alleged or proved they were terminated for a reason that contravenes public policy. In Gardner, 128 Wash.2d at 936-41, 913 P.2d 377, we reiterated the admonition of Thompson: "the exception [to the at-will doctrine] should be narrowly construed in order to guard against frivolous lawsuits.... `[C]ourts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject.'" Gardner, 128 Wash.2d at 936-37, 913 P.2d 377 (emphasis omitted) (quoting in part Thompson, 102 Wash.2d at 232, 685 P.2d 1081). In Gardner, we stated, consistent with this principle, that courts have generally found the contravention of a clear mandate of public policy in four limited situations: "(1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation ...; (3) where employees are fired for exercising a legal right or privilege...; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistleblowing." Id. at 936, 913 P.2d 377. The touchstone of these exceptions is whether the employee's termination would contravene some public, as opposed to a purely private, interest. See Dicomes v. State, 113 Wash.2d 612, 618, 782 P.2d 1002 (1989) ("public policy concerns ... what affects the citizens of the State collectively") (quoting Palmateer v. International Harvester Co., 85 Ill.2d 124, 130, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981)); Foley v. Interactive Data Corp., 47 Cal.3d 654, 765 P.2d 373, 379, 254 Cal.Rptr. 211, 217 (1988) (court must inquire whether discharge affects duty which "inures to the benefit of the public at large rather than to a particular employer or employee"); see generally 2 CHARLES B. CRAVER ET AL., EMPLOYMENT LAW § 9.10, at 269-70 (Mark A. Rothstein ed., 1994).
If Reninger and Cohen were "set up," as they allege, then the State arguably violated a "statutory or regulatory provision" by terminating Reninger and Cohen without cause. See RCW 41.06.186 (authorizing the personnel resources board to adopt rules relating to the termination of state employees); WAC 356-34-010, WAC 356-34-040 (defining "cause" for dismissal and providing that public employees may be dismissed "for cause"). The alleged impetus for the plaintiffs' termination does not, however, fall within one of the categories we recognized in Dicomes. Nor does their firing contravene public policy. Reninger and Cohen claimed they did not leave any firearms unattended and their fellow employees concocted this scheme, based on a personal vendetta, in an effort to get them fired. Although this conduct is certainly unworthy of fellow officers, it does not affect the public collectively, and therefore does not constitute a wrongful discharge under Thompson and Dicomes. If we were to permit the officers to state a wrongful discharge claim simply by alleging that their employer violated a statute, even though the statute has nothing to do with the public as a whole, we would be extending the tort far beyond the parameters set by *788 Thompson and Dicomes. Reninger and Cohen failed to state a claim for wrongful discharge as we defined that concept in Dicomes.
B. TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
Reninger and Cohen claim their fellow officers tortiously interfered with their business expectancy, presumably their employment by DOC. At the outset, there is a question as to whether they state a claim against their fellow officers under this theory. The officers concede they do not state a claim under this theory against DOC because their remedy against DOC lies in contract. A party cannot tortiously interfere with its own contract. Olympic Fish Prods., Inc. v. Lloyd, 93 Wash.2d 596, 611 P.2d 737 (1980); Houser v. City of Redmond, 91 Wash.2d 36, 586 P.2d 482 (1978); Calbom v. Knudtzon, 65 Wash.2d 157, 396 P.2d 148 (1964); Hein v. Chrysler Corp., 45 Wash.2d 586, 277 P.2d 708 (1954); see also W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 129, at 990 (5th ed.1984) (and cases cited at n. 24). Arguably, if the fellow employee is acting within the scope of his or her employment, the employee similarly cannot state a claim against that fellow employee in tort.[4] We do not reach this question here as Reninger and Cohen are collaterally estopped to assert their claim of tortious interference.
C. COLLATERAL ESTOPPEL
The doctrine of collateral estoppel is well-known to Washington law as a means of preventing the endless relitigation of issues already actually litigated by the parties and decided by a competent tribunal. Collateral estoppel promotes judicial economy and prevents inconvenience, and even harassment, of parties. Hanson v. City of Snohomish, 121 Wash.2d 552, 561, 852 P.2d 295 (1993). The elements of collateral estoppel are also well-known:
(1) identical issues; (2) a final judgment on the merits; (3) the party against whom the plea is asserted must have been a party to or in privity with a party to the prior adjudication; and (4) application of the doctrine must not work an injustice on the party against whom the doctrine is to be applied.
Southcenter Joint Venture v. National Democratic Policy Comm., 113 Wash.2d 413, 418, 780 P.2d 1282 (1989) (quoting Shoemaker v. City of Bremerton, 109 Wash.2d 504, 507, 745 P.2d 858 (1987)). The first three elements are plainly met here. The officers dispute the fourth because of the differences between the civil service remedies and those available in a civil tort action.
Decisions of administrative tribunals may have preclusive effect under Washington law. We first recognized in Luisi Truck Lines, Inc. v. Washington Util. & Transp. Comm'n, 72 Wash.2d 887, 894, 435 P.2d 654 (1967) (citing 2 KENNETH CULP DAVIS, ADMINISTRATIVE LAW TREATISE § 18.12 (1958)), that the determinations of an administrative agency can have preclusive effect under collateral estoppel principles. The United States Supreme Court also accords preclusive collateral estoppel effect to decisions of administrative agencies. Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 107-08, 111 S.Ct. 2166, 2169, 115 L.Ed.2d 96 (1991).
The Supreme Court said in United States v. Utah Constr. & Mining Co., 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966), "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose." We have cited this language with approval on two occasions: Stevedoring Servs., Inc. v. Eggert, 129 Wash.2d 17, 40, 914 P.2d 737 (1996); State v. Dupard, 93 Wash.2d 268, 274, 609 P.2d 961 (1980).
*789 We have employed three criteria for deciding whether to apply collateral estoppel to the findings of an administrative body: "`(1) whether the agency acting within its competence made a factual decision; (2) agency and court procedural differences; and (3) policy considerations.'" Stevedoring Servs., 129 Wash.2d at 40, 914 P.2d 737 (quoting Shoemaker, 109 Wash.2d at 508, 745 P.2d 858). The PAB here plainly acted within its competency, but the officers assert the PAB determination did not meet the second and third criteria.
In listing reasons why the PAB procedure was significantly different from the procedures available to Reninger and Cohen in superior court, the officers claim the PAB's failure to adhere to the rules of evidence vitiates the Board's proceedings and justifies relitigation of the same factual issues in a trial court, where the rules of evidence apply. We disposed of this same argument in Shoemaker v. City of Bremerton, 109 Wash.2d 504, 511, 745 P.2d 858 (1987):
As for the rules of evidence not being in force, this is generally true of administrative hearings. To hold that it deprives the decision here of preclusive effect would, in effect, be to completely abolish administrative collateral estoppel. In light of the other, sufficient procedural formalities observed, we see no reason to do so.[[5]]
As is true for any quasi-judicial proceeding under the Administrative Procedure Act (APA), appropriate procedural protections must be afforded the parties. The PAB decision makers are competent. The "[p]ersons appointed to the board shall be qualified by experience and training in the field of administrative procedures and merit principles." RCW 41.64.010(1); WAC 358-01-020(1). The PAB members sit as factfinders, not as determiners of the law. They are no more or less competent than a jury to do so. Shoemaker, 109 Wash.2d at 511, 745 P.2d 858. Moreover, a good argument can be made that a panel "qualified by experience and training in the field of administrative procedures and merit principles" is likely to reach a just and fair result on a personnel issue.
Reninger and Cohen were afforded and took advantage of numerous procedures that obtain in superior court trials. Both were represented by counsel who gave opening statements and closing arguments. Reninger and Cohen called witnesses on their behalf and cross-examined the State's witnesses. They subpoenaed and obtained documents through the PAB's formal discovery process prior to the hearing. They also conducted formal depositions under oath prior to the PAB hearing. Very little of significance distinguished the administrative proceedings in this case from a formal jury trial in superior court.
In Dupard we said, "The doctrine [of collateral estoppel] may be qualified or rejected when its application would contravene public policy." 93 Wash.2d at 276, 609 P.2d 961. This, of course, is a fundamental aspect of the doctrine. It must not apply "so rigidly as to defeat the ends of justice, or to work an injustice." Henderson v. Bardahl Int'l Corp., 72 Wash.2d 109, 119, 431 P.2d 961 (1967); accord State v. Williams, 132 Wash.2d 248, 937 P.2d 1052 (1997) (rejecting for public policy reasons application of collateral estoppel in a criminal proceeding regarding a prior Department of Social and Health Services determination). Reninger and Cohen principally contend collateral estoppel should not apply because of a "disparity of relief" between what the PAB could award Reninger and Cohen and the tort relief available to them in superior court, specifically, monetary damages.
In Shoemaker, we explicitly held disparity in relief does not justify ignoring the strictures of collateral estoppel:
Shoemaker argues that the Commission's finding should not be given collateral estoppel effect as a matter of public policy because the disparity between the relief offered by the administrative agency and the federal district court would lead litigants to forgo their administrative remedies for fear of preclusion in other, more substantial claims. See, e.g., Mack v. South Bay Beer Distribs., Inc., 798 F.2d *790 1279 (9th Cir.1986). This is a persuasive argument, depending on the actual disparity.
In Mack, the relief at issue was unemployment compensation. Here, the Commission had the power to order reinstatement and back pay; in other words the same relief awarded as consequential damages in the federal court. RCW 41.12.090. Shoemaker also made claims for emotional distress in the civil rights suit which could not have been awarded by the Commission, but this disparity, given the uncertainty of such recovery, is not as great as the disparity of relief in Mack. As a result, collateral estoppel in this case does not violate public policy or work an injustice because of disparity in relief.

Shoemaker, 109 Wash.2d at 513, 745 P.2d 858 (emphasis added).[6] Likewise, in this case, the PAB had the power to order reinstatement and back pay, plus sick leave, vacation accrual, retirement, and Old-Age, Survivors, and Disability Insurance (42 U.S.C. § 401 et seq.) credits. RCW 41.06.220. "Any employee, when fully reinstated after appeal, shall be guaranteed all employee rights and benefits, including back pay, sick leave, vacation accrual, retirement and OASDI credits as provided for in RCW 41.06.220." WAC 358-30-180. There was no disparity of relief to distinguish this case from Shoemaker.
Disparity of relief between what one can recover in the first action compared to what one can recover in the second action is not the gravamen of the decision whether to apply collateral estoppel to the findings of an administrative board. Rather, courts look to disparity of relief to determine whether sufficient incentive existed for the concerned party to litigate vigorously in the administrative hearing. Courts have reasoned that, if the amount a party can recover in an administrative proceeding is insignificant, the party is not likely to have litigated the crucial issues vigorously and it would be unfair to employ collateral estoppel against that party in future proceedings to prevent the relitigation of those same issues in another forum.
"Where relatively small amounts are at stake, the incentive to vigorously litigate the matter may be small." Lewis v. International Bus. Mach. Corp., 393 F.Supp. 305, 308 (D.Or.1974) (refusing because of unfairness to apply collateral estoppel to findings of an unemployment benefits hearing in a wrongful discharge action). Comment j to RESTATEMENT (SECOND) OF JUDGMENTS § 28 (1982) points out a party may not have had an adequate opportunity to litigate when "the *791 amount in controversy in the first action may have been so small in relation to the amount in controversy in the second that preclusion would be plainly unfair."
In the present case, Reninger and Cohen displayed no lack of incentive to litigate in the administrative arena. They vigorously opposed their demotions: they argued their case to a hearing examiner; they appealed the hearing examiner's findings against them to the PAB; and they attempted to appeal the PAB's findings to the superior court pursuant to RCW 41.64.130. It was only after their lack of success in the administrative arena that they relabeled their claims as wrongful discharge and tortious interference, and relitigated the identical issues before a jury in a civil trial. The same bundle of operative facts was before both the PAB and the jury: did Reninger and Cohen fail to secure the shotguns, or were they "set up" by their superiors? Reninger and Cohen were entitled to one bite of the apple, and they took that bite. That should have been the end of it. The normal rules of collateral estoppel apply here to prevent successive and vexatious litigation. "Any other result would render the administrative forum a place for meaningless dry runs of wrongful termination claims[.]" Miller v. County of Santa Cruz, 39 F.3d 1030, 1038 (9th Cir.1994), cert. denied, 515 U.S. 1160, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995). Reninger and Cohen are collaterally estopped to relitigate the misconduct issues.

CONCLUSION
The correctional officers failed to state claims for wrongful constructive discharge, and their claims for tortious interference with a business expectancy were collaterally estopped by the decision in the PAB proceedings. We reverse the judgment on the verdict of the jury and remand the case to the Pierce County Superior Court for entry of a judgment dismissing the officers' complaint with prejudice.
DURHAM, C.J., and DOLLIVER, GUY and JOHNSON, JJ., concur.
SANDERS, Justice (dissenting).
The issues here are whether civil servants have a right of action against their government employer for wrongful constructive discharge, and whether they may obtain meaningful redress in courts of law for employment-related torts. I would hold the government employer to the same legal standard as any private employer and dissent from the decision of the majority which relegates civil servants to second class citizenship.
At the conclusion of a month long jury trial by their peers, plaintiffs Reninger and Cohen recovered nearly a half million dollar judgment against the State on two independent grounds: wrongful constructive discharge and tortious interference with business expectancy. To reverse this jury verdict it would therefore be necessary to conclude both claims are barred as a matter of law as, without dispute, this verdict is amply supported by substantial evidence.
The claims of wrongful constructive discharge and tortious interference with business expectancy are separate, and distinct, and each is based upon its own particular facts.

Wrongful Constructive Discharge
The claim for wrongful constructive discharge relates to termination of Reninger and Cohen from Department of Corrections (DOC) employment as a result of their temporary reassignments to hazardous duties. This reassignment chronologically followed, but was distinct from, employment discipline imposed upon them for allegedly misplacing firearms. Hence maintenance of this cause of action is perfectly consistent with a determination of the Personnel Appeals Board that they had misplaced the firearms as well as the DOC order that, as a disciplinary measure, these persons should be temporarily demoted for four months with reduction of paybut not fired. However, they were fired in fact when they could not have been fired in law. Such is the very essence of wrongful constructive discharge.
This post discipline reassignment was a decision of supervisory staff, and was never *792 reviewed administratively. It was that unilateral reassignment which resulted in the constructive discharge.
The majority therefore completely misstates the basis of the constructive discharge claim which is in no way dependent upon any finding that the discipline was unjustified, much less that they were "set up." Compare Majority at 787.
Contrary to the claim of the majority, this wrongful constructive discharge does "contravene public policy" (Majority at 787) because pursuant to the civil service statute, a civil servant may not be fired absent the requisite procedure which ends in a formal determination that firing is appropriate. But there was neither such procedure undertaken nor determination made that they be fired. To the contrary Reninger and Cohen were constructively terminated, as found the jury, and wrongfully so, because their termination was in violation of the civil service statute as they were fired in fact under circumstance where they could not be fired in law. Notwithstanding, the majority overturns the jury determination that these employees were victims of wrongful constructive discharge solely because the majority mistakenly asserts "Reninger and Cohen have not alleged or proved they were terminated for a reason that contravenes public policy." Majority at 787. I beg to differ.
In Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 233, 685 P.2d 1081 (1984), we held an employer can be liable in tort if he or she discharges an employee for a reason that contravenes a clear legislatively or judicially recognized mandate of public policy.[1] Determining what qualifies as a clear mandate of public policy is a question of law. Gardner v. Loomis Armored, Inc., 128 Wash.2d 931, 937, 913 P.2d 377 (1996). There are four elements of a wrongful termination tort. The plaintiffs must prove (1) the existence of a clear public policy; (2) that discouraging the conduct in which they engaged would jeopardize the public policy; (3) that the dismissal violated the public policy; and (4) that no overriding justification for the dismissal existed. Id. at 941, 913 P.2d 377.
As the Supreme Court of Wisconsin stated, "[P]ublic policy must be evidenced by a constitutional or statutory provision." Brockmeyer v. Dun & Bradstreet, 113 Wis.2d 561, 335 N.W.2d 834, 840 (1983). Here, the jury found Cohen and Reninger were forced into intolerable conditions when they were transferred to remote cellblocks housing dangerous inmates, necessarily concluding their resignations were the result of a constructive discharge. Such factual finding was well within the province of the jury and certainly based on substantial evidence.
Dismissal of Cohen and Reninger, civil servants, by DOC violates public policy unless accomplished through overt compliance with the civil service statute and regulations. According to administrative code provisions in effect at the time, adopted pursuant to RCW 41.06.186, plaintiffs could be dismissed only for specific reasons, WAC 356-34-010, and pursuant to a specified procedure. For example, the DOC must notify an employee in writing of the specified charges within 15 calendar days prior to the effective date of the dismissal. WAC 356-34-040.
While the DOC followed correct procedures for temporary demotion, it neither sought nor purported to follow procedures necessary to effect an outright dismissal. Nor was dismissal the overt sanction imposed. However, termination by constructive discharge was the result (as found the jury) when Cohen and Reninger both resigned rather than report to their temporary assignments in dangerous work areas. These discharges were therefore unsupported by, and contrary to, statutory and administrative provisions which allowed temporary demotion but not outright termination. In sum, if an employee has a legal right not to be fired, then he or she also has a legal right not to be constructively discharged. Such is the universal rule for both public and private employees. Compare, e.g., Fleming v. Pima County, 141 Ariz. 149, 685 P.2d 1301, 1305-06 (1984) (civil servant has valid claim against *793 government employer for constructive discharge).
These public employees were constructively discharged in violation of specific provisions of the civil service statute. Such is a matter of public interest since (1) any discharge in violation of statute is of public concern and (2) the civil service statute, in particular, was enacted precisely to accomplish an alleged public purpose. Therefore constructive discharge of a public employee in violation of an applicable statute is a much more straightforward violation of "public policy" than is the termination of a private employee for whistle blowing activity not in clear violation of an express statutory mandate. Compare Dicomes v. State, 113 Wash.2d 612, 617, 782 P.2d 1002 (1989) ("[A]bsent some prior legislative or judicial expression on the subject," public policy may nonetheless be violated by discharge for whistle blowing.) (quoting Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 232, 685 P.2d 1081 (1984)).
By its holding the majority consigns civil servants to second class citizenship. The majority denies civil servants any remedy for wrongful discharge in violation of statute, effectively immunizing government employers from accountability for violations of state law, but without statutory authority, and contrary to the statutory repeal of sovereign immunity. RCW 4.92.090. Such a doubtful step is for the legislature, not the courts. Compare Const. art. I, § 12 ("No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations.").

Tortious Interference with Business Expectancy
The majority sets aside a half million dollar verdict against co-workers for tortious interference with business expectancy, asserting the administrative decision of the Personnel Appeals Board, although never judicially reviewed, bars the tortious interference claim as a matter of law.[2]
The majority's opinion on this point is particularly problematic when we recall that the co-workers were not even parties to the Personnel Appeals Board (PAB) hearing, and the PAB had no jurisdiction to even consider a cause of action for tortious interference with business expectancy, much less provide a remedy in damages. Nonetheless, it is true Cohen and Reninger were parties to the PAB proceeding and the PAB entered a finding of fact inconsistent with their tortious interference claim. But that is not necessarily fatal.
The party who asserts collateral estoppel has the burden to prove it. McDaniels v. Carlson, 108 Wash.2d 299, 303-04, 738 P.2d *794 254 (1987); Bradley v. State, 73 Wash.2d 914, 917, 442 P.2d 1009 (1968).
Affirmative answers must be given to the following questions before collateral estoppel is applicable:
(1) Was the issue decided in the prior adjudication identical with the one presented in the action in question? (2) Was there a final judgment on the merits? (3) Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication? (4) Will the application of the doctrine not work an injustice on the party against whom the doctrine is to be applied?
Rains v. State, 100 Wash.2d 660, 665, 674 P.2d 165 (1983) (quoting Lucas v. Velikanje, 2 Wash.App. 888, 894, 471 P.2d 103, review denied, 78 Wash.2d 994 (1970)). Sometimes an aspect of the fourth question is recast as: "In the prior trial, did the party against whom the estoppel is asserted have interests at stake that would call for a full litigational effort?" 14 Lewis H. Orland & Karl B. Tegland, Washington Practice § 373, at 763 (5th ed.1996). Additionally, for an issue to be precluded it must have been actually litigated and necessarily determined in the prior litigation. Peterson v. Department of Ecology, 92 Wash.2d 306, 312, 596 P.2d 285 (1979).
Attempts to attach preclusive effect to administrative determinations are particularly problematic.
[A]dministrative decisions are particularly vulnerable to challenge when they are tendered as preclusive in subsequent litigation because of the settings in which they are rendered. This conclusion arises for a variety of reasons: the informality of some administrative proceedings; the vagueness of party and joinder concepts in others; the scanty record made in still others; and, perhaps most importantly, the fear that the governmental agencies would be forced to engage in countless appeals to avoid being bound by adverse decisions.
14 Lewis H. Orland & Karl B. Tegland, supra, § 359, at 721-22.
The "final judgment" element of the doctrine references a final judgment of a court having subject matter and in personam jurisdiction. Restatement (Second) of Judgments §§ 1, 17 (1980). Nevertheless we have afforded preclusive effect to final adjudicatory determinations of an administrative agency where other elements of the doctrine are satisfied and procedural prerequisites are met, giving due regard to the "magnitude and complexity of the matter in question" as well as the "urgency with which the matter must be resolved." Restatement (Second) of Judgments § 83(2)(e) (1980). But we have further conditioned the doctrine's applicability to administrative determinations upon analysis of several different factors to include:
(1) whether the agency acting within its competence made a factual decision; (2) agency and court procedural differences; and (3) policy considerations.
State v. Dupard, 93 Wash.2d 268, 275, 609 P.2d 961 (1980).
Assuming the elements of collateral estoppel are otherwise present, interrelated considerations of the limited nature of the administrative proceeding, the lack of incentive to litigate at the administrative level, the great disparity between available administrative and judicial relief, as well as the public policy against discouraging individuals from utilizing available administrative remedies, provide more than adequate basis to affirm this trial court's ultimate determination not to bar this claim for reasons of collateral estoppel.
Civil servants who are dissatisfied with employment disciplinary measures imposed by supervisory personnel are afforded a quick and easy optional appeal to the Personnel Appeals Board to contest the propriety of that discipline. RCW 41.64.090. As was the case here, the Board may expedite the procedure by employing a hearing examiner "to preside over hearings and make recommended decisions...." WAC 358-30-020. By rule the hearings are informal, and technical rules of evidence do not apply. WAC 358-30-030(2). The Board may restore to the employee those employment rights and benefits wrongfully withheld, WAC 358-30-180, however, it lacks jurisdiction to grant relief beyond that.
*795 Here Cohen and Reninger appealed a four-and-one-half-month temporary demotion (February 10, 1989 to June 29, 1989) with commensurate reduction in pay amounting to approximately $300 per month. See Exs. 22, 31. The maximum either could have recovered would have been about $1200 had they maintained their employment during the entire four-and-one-half-month period; however, they quit after little more than one month.
Although Cohen and Reninger appealed the demotion prior to its effective date, that appeal did not stay the imposition of the discipline nor did it encompass the temporary transfer, much less its destinationthe independent cause of their constructive discharge. When Cohen and Reninger each quit their employment with DOC in March 1989 they had to date experienced a cumulative pay loss of little more than $300 each. That would have been the upper limit of recovery had they been totally successful before the PAB.
The PAB hearing did not even occur until June and August 1989, long after the temporary demotion, transfer, and termination had already transpired. And the final PAB decision was not rendered until several months after that. However, included within the PAB decision was a factual finding that three shotguns were left in the range building between October 18 and October 22, 1988, that the "only rational explanation" for the shotguns being there was that Cohen and Reninger failed to account for them after the training was conducted and that "[t]here was no evidence that anyone else had access to the weapons during the time in question," nor "credible evidence of collusion among others to implicate them." Clerk's Papers (PAB's "Findings, Conclusions and Order of Board Following Hearing on Exceptions" (Mar. 15, 1990)) at 66.
Although co-workers were not party to the proceeding, and the most Cohen and Reninger could gain had they been successful in the proceeding was little more than $300 each, co-workers claim that the half million dollar jury verdict rendered against them as a result of the ensuing lengthy and complex civil litigation must be set aside as a matter of law.
Were that the result, several consequences would logically followall bad.
Those similarly situated to Cohen and Reninger would probably forgo any administrative appeal for fear the much more substantial superior court remedy for tortious interference would be barred by a possible adverse administrative result. Such was precisely the reason the United States Courts of Appeals for the Ninth Circuit reversed a dismissal on collateral estoppel grounds under analogous, if not less aggravated, circumstances in Mack v. South Bay Beer Distribs., Inc., 798 F.2d 1279, 1284 (9th Cir.1986).
Henry Mack was fired by South Bay Beer Distributors, Inc. He subsequently sought but was denied state unemployment insurance benefits, the administrative appeals board affirming the denial, finding Mack was justifiably fired due to his conduct. However thereafter Mack brought suit in federal district court alleging the real reason for his dismissal was age discrimination in violation of the Age Discrimination in Employment Act and in further breach of a state employment contract. The district court dismissed his substantial state and federal claims in deference to the adverse administrative determination on employment benefits; however, the United States Court of Appeals reversed holding such result would (1) be unfair to the employee and (2) undermine the very purpose of the administrative process.
[A]n employee's incentive to litigate an unemployment benefits claim is generally much less than his incentive to litigate a discrimination claim where generally the stakes are much higher. When the amount in controversy in the first action is much less than the amount in controversy at the second, preclusion would be unfair. Restatement (Second) Judgment § 28(5), comment (j) (1982).
Mack, 798 F.2d at 1284 (emphasis added). Evidencing concern that the administrative process would be overwhelmed, the United States Court of Appeals adopted a second independent ground for reversal, holding implicitly *796 an employee with a federal discrimination claim might have to decide to forego state unemployment benefits rather than risk an adverse ruling that could have preclusive effect on a federal discrimination claim that he may not be adequately prepared to litigate before the Board. Moreover, the potentially higher awards at stake in discrimination claims could compel both employers and employees to litigate every unemployment benefits claim as if it encompassed a discrimination suit. Should this come to pass the Board may find it difficult to adjudicate unemployment benefit claims expeditiously. Consequently, an unemployed worker would be without benefits for a longer period of time than would be the case if his appeal had been decided without the additional delay created by determining a discrimination claim.
Id.
Each of these considerations applies with equal, if not greater, force to the case before us. Not only would claimants be effectively forced out of the administrative process but, if they remained in it, the process would be overwhelmed with litigation primarily aimed not at recovery of the comparatively meager benefits available in a quick, easy, and informal procedure but rather the painful erection and/or avoidance of issue preclusion for the purpose of future litigation, even with third parties.
These same concerns have also been credited in our jurisdiction. For example we declined to collaterally estop a felony prosecution for welfare fraud notwithstanding a prior inconsistent administrative result. State v. Williams, 132 Wash.2d 248, 937 P.2d 1052 (1997). Holding collateral estoppel under those circumstances works an injustice, thereby violating the fourth prong of the doctrine, we observed such would have "broad consequences" and "would result in longer administrative hearings and greater delays since the State would `be required to marshall all of the prosecution's potential witnesses and evidence at the administrative level.'" Williams, 132 Wash.2d at 258, 937 P.2d 1052 (quoting People v. Sims, 32 Cal.3d 468, 651 P.2d 321, 337, 186 Cal.Rptr. 77 (1982) (Kaus, J., dissenting) (emphasis added), superseded by statute as stated in People v. Preston, 43 Cal.App.4th 450, 50 Cal.Rptr.2d 778 (1996)). We refused to apply collateral estoppel under those circumstances because it would force undue expenditure of resources on administrative matters and,
[a]s a result, the State most likely would consider foregoing administrative hearings even though such hearings allow it to recoup financial losses resulting from fraud. Public policy militates against this. We therefore reverse the Court of Appeals and hold that the doctrine of collateral estoppel does not bar the State from prosecuting Williams.
Williams, 132 Wash.2d at 258, 937 P.2d 1052 (emphasis added).
Although we declined to avoid the collateral estoppel bar on policy grounds in Shoemaker v. City of Bremerton, 109 Wash.2d 504, 513, 745 P.2d 858 (1987), we did recognize the validity of the policy principle, while refusing to apply it to those less egregious facts. There a deputy chief of police, Joe Shoemaker, petitioned the Bremerton Civil Service Commission for reinstatement after reduction in rank and salary. The commission rejected his claim that he was demoted as an unlawful retaliation. His subsequent civil rights action was dismissed on collateral estoppel grounds, a result affirmed by this court.
Shoemaker argues that the Commission's finding should not be given collateral estoppel effect as a matter of public policy because the disparity between the relief offered by the administrative agency and the federal district court would lead litigants to forgo their administrative remedies for fear of preclusion in other, more substantial claims. See, e.g., Mack v. South Bay Beer Distribs., Inc., 798 F.2d 1279 (9th Cir.1986). This is a persuasive argument, depending on the actual disparity.

Shoemaker, 109 Wash.2d at 513, 745 P.2d 858 (emphasis added). The court, however, found the specific disparity in Shoemaker between the available administrative remedy (which would have included reinstatement and back pay) and the judicial one (which would provide the equivalent relief plus "uncertain[]" *797 damages for emotional distress) "is not as great as the disparity of relief in Mack. As a result, collateral estoppel in this case does not violate public policy or work an injustice because of disparity in relief." Shoemaker, 109 Wash.2d at 513, 745 P.2d 858. Thus the Shoemaker exception proved the rule set forth in Mack by not applying it to facts less compelling.
The judicial standard against which the actual disparity in potential relief is measured is a prospective and objective one. It is the same standard the reasonable person would apply when choosing between availing oneself of a potential administrative remedy or, on the other hand, forgoing the administrative remedy for fear collateral estoppel would bar a subsequent judicial one. If the incentive to seek administrative relief is reasonably offset by the risk of a collateral estoppel bar, the disparity of potential remedy is too great, and judicial imposition of the bar is improper on public policy grounds.
The majority opinion illustrates and accentuates the exact vice which this public policy doctrine is intended to avoid. Rather than even applying an objective standard, the majority relies upon the subjective decision of Reninger and Cohen to actively participate in this administrative hearing as exactly the reason their subsequent claim in tort against their co-workers should be barred. See Majority at 789. Had Reninger and Cohen not appealed the adverse employment action to the PAB in the first place, however, there could be no basis upon which a collateral estoppel bar could be asserted, nor would there be any basis for a claim that their failure to exhaust an even adequate administrative remedy could bar a tort action against a third person. Thus, the majority's message is clear: Avoid administrative tribunals at all cost![3]
Moreover the majority confuses "lack of incentive to litigate" (Majority at 791) with the actual litigation undertaken. These considerations are very different. Compare Mack, 798 F.2d at 1284 ("incentive to litigate"); Williams, 132 Wash.2d at 258, 937 P.2d 1052 ("would result in longer administrative hearings"); Shoemaker, 109 Wash.2d at 513, 745 P.2d 858 ("would lead litigants to forgo their administrative remedies") (emphasis added). The fact that Reninger and Cohen actively participated in the administrative proceedings under these circumstances only demonstrates their failure to adequately predict the majority's holding that collateral estoppel attaches. Had this judicial aberration been accurately foretold they would not only have refrained from litigation at the administrative level, but their sanity would have been suspect had they proceeded to do so. But in the future informed litigants in the position of Reninger and Cohen will avoid the administrative process like the plague.

Conclusion
I would hold civil servants, just as private employees, may not be constructively discharged from their employment under circumstances where the law forbids their employer from formally terminating them. Additionally I would protect their legal right to their day in court to pursue their tort claims against third persons before a jury of their peers. But what the jury has awarded, the majority takes away. I dissent.
SMITH, J., concurs.
ALEXANDER, Justice (concurring in dissent).
Although I agree with the majority that Reninger and Cohen failed to state claims for *798 wrongful constructive discharge, I nevertheless concur in the dissent by Justice Sanders. I do so because I agree with the conclusion reached in the dissent to the effect that the decision of the Personnel Appeals Board does not, as a matter of law, bar the plaintiffs' tortious interference claims. That being the case, the verdict must stand. I reach the latter conclusion because the jury verdict was not segregated and, therefore, it is not possible to determine if any portion of the judgment is compensation for the wrongful discharge claim. While we could remand for a determination of that issue, that makes little sense because the State has agreed to indemnify the state employee defendants for any judgment rendered against them in their individual capacity, thus making the State financially responsible for the damages flowing from both the tortious interference and wrongful discharge claim.
MADSEN, J., concurs.
NOTES
[1] Reninger and Cohen apparently failed to file a timely notice of appeal from the PAB decision in the proper county.
[2] Neither officer utilized the civil service appeals process or complained to the Department of Labor & Industries under the Washington Industrial Safety and Health Act (WISHA) concerning their reassignments. They did, however, file unemployment claims. These claims were initially denied on the basis Reninger and Cohen had left their positions voluntarily and "without good cause." They then appealed to the Office of Administrative Hearings (OAH) which held they were justified in resigning to avoid a significant threat to their safety and a complaint to their superiors would have been futile. The Commissioner of Employment Security affirmed the OAH decision.
[3] The jury verdict form did not include DOC among the listed defendants against whom a verdict could be rendered, even though only DOC could discharge the officers. Without objection, the trial court's judgment was entered against DOC in light of DOC's contract to indemnify the individual defendants.
[4] For example, in Houser, the plaintiffs sued the City of Redmond for tortious interference with a contract to which Redmond was a party because of the acts of Redmond's employees. We held that if Redmond's employees were acting within the scope of their employment, their actions were the actions of the City itself and the plaintiffs' remedy was an action for breach of contract. If the employees' actions were outside the scope of their employment with Redmond, the City was not responsible for their acts; the plaintiffs could sue the employees individually, but not the City of Redmond, for tortious interference. Houser, 91 Wash.2d at 39, 40, 586 P.2d 482.
[5] In hearings before the PAB, prehearing discovery pursuant to the civil rules is permitted, WAC 358-30-150(1), as are subpoenas and subpoenas duces tecum, WAC 358-30-120(1).
[6] Although in Shoemaker we rejected the approach of the Court of Appeals for the Ninth Circuit in Mack v. South Bay Beer Distribs., Inc., 798 F.2d 1279 (9th Cir.1986), it is useful to note Mack does not in any sense stand for the proposition that, standing alone, disparity of relief as defined by the amount of money a plaintiff may obtain is a public policy reason for disregarding the principles of collateral estoppel. Mack's employer fired him. An agency denied Mack's application for unemployment benefits. On appeal, the California Unemployment Insurance Appeals Board affirmed the denial of benefits, finding Mack's employer had fired him for misconduct. Instead of appealing the Board's determination in state court. Mack brought suit in federal court against his former employer for age discrimination under the Age Discrimination in Employment Act. The district court dismissed the action, holding it was barred by collateral estoppel. The Mack court reversed, refusing to apply collateral estoppel. In a later opinion, the Court of Appeals for the Ninth Circuit explained the Mack result:

[I]n Mack [we] declined to give an unreviewed administrative hearing preclusive effect primarily because the plaintiff had had no opportunity to litigate his age discrimination claim.... The nature of the unemployment compensation hearing had denied him the opportunity to litigate his claim and it was unclear if any evidence at all on the issue of age discrimination had been presented.
Eilrich v. Remas, 839 F.2d 630, 633 (9th Cir.), cert. denied, 488 U.S. 819, 109 S.Ct. 60, 102 L.Ed.2d 38 (1988). We employed similar reasoning recently in State v. Williams, 132 Wash.2d 248, 937 P.2d 1052 (1997). A DSHS administrative law judge had found Williams not guilty of welfare fraud. Nevertheless, she was subsequently tried and convicted in superior court for first degree theft stemming from welfare fraud. On appeal, we held collateral estoppel did not apply to the administrative hearing result because, among other things, the purpose of the criminal prosecution was to determine whether Williams had committed a crime, an inquiry better addressed to the criminal justice system. Id. at 256, 937 P.2d 1052. No such situation obtains in the case at bar. In the administrative proceedings, Reninger and Cohen strenuously litigated the facts at issue in their subsequent case in superior court.
[1] This case does not concern constructive discharge as a breach of an employer's express or implied employment contract. Compare Turner v. Anheuser-Busch, Inc., 7 Cal.4th 1238, 876 P.2d 1022, 1030, 32 Cal.Rptr.2d 223, 231 (1994).
[2] The majority also seems to suggest, without deciding, that perhaps a government worker cannot assert a tortious interference claim against a co-worker, citing Houser v. City of Redmond, 91 Wash.2d 36, 586 P.2d 482 (1978) and other authorities. Houser does not stand for the proposition that an employee is immune from liability if he acts within the scope of his duties. In Houser, the plaintiff sued the City of Redmond for tortious interference with contract but did not name as additional defendants those employees who committed the tort on behalf of their municipal employer. We held Redmond was not liable because it could not, as a matter of law, interfere with its own contract. Dicta, however, suggested co-workers were similarly immune from liability if they acted within the scope of their employment. Id.; see also Eserhut v. Heister, 52 Wash.App. 515, 521, 762 P.2d 6 (1988) ("On appeal, the court stated in dictum that if the actions of the coemployees were not within the scope of their employment, then they were third parties who were potentially liable for the tort."). Notwithstanding, it is the established rule in Washington an employee who commits the tort of interference with the contractual relations of his coemployees is liable regardless of the scope of his duties and regardless whether or not he acted within the scope of his duties. See Eserhut, 52 Wash.App. at 519, 762 P.2d 6 ("[I]f the elements of the tort are otherwise met, then the coemployees can be held liable for intentionally interfering with [plaintiff's] employment with [the employer]."); accord Lewis v. Oregon Beauty Supply Co., 302 Or. 616, 733 P.2d 430, 434 (1987) (co-worker tortiously interfered with plaintiff's contract with employer; no discussion of scope of duties). Remand would therefore be unnecessary because the scope of the co-worker's duties is irrelevant. Moreover, the case upon which Houser relied, Hein v. Chrysler Corp., 45 Wash.2d 586, 600, 277 P.2d 708 (1954), specifically declined to address whether an agent acting within the scope of his duties may tortiously interfere with his employer's contract.
[3] The majority also states: "Very little of significance distinguished the administrative proceedings in this case from a formal jury trial in superior court." Majority at 789. Apparently the majority sees no "significant" distinction between an independent judiciary and a proceeding captive to the executive branch, much less of the fundamental right to jury trial. Compare Washington Const. art. IV, § 6 ("Jurisdiction of superior courts ... The superior court shall have original jurisdiction in all cases at law....") and Const. art. I, § 21 ("The right of trial by jury shall remain inviolate....") (emphasis added). Thus the majority denies Officers Reninger and Cohen their day before an independent court of law, and substitutes a factual finding made by a member of the executive branch for that of the jury. Such is not only "significant," it strikes at the very heart of our tort system. Cf. Sofie v. Fibreboard Corp., 112 Wash.2d 636, 771 P.2d 711, 780 P.2d 260 (1989) (statute which caps damages awarded by jury is unconstitutional).